Debra R. RIPLEY

v.

**ANDERSON COUNTY BOARD OF EDUCATION, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

June 17, 2008 Session.

Oct. 15, 2008.

Permission to Appeal Denied by Supreme Court May 4, 2009.

Arthur F. Knight, Knoxville, Tennessee, for the appellants, Anderson County Board of Education; V.L. Stonecipher, Director of Schools; and Anderson County Board of Education Members: Dr. John Burrell, Gail Martin, Greg Crawford, Ron Hagans, Peggy Hayes, and Wanda McCrosky.

J. Mikel Dixon, Knoxville, Tennessee, for the appellee, Debra R. Ripley.

**OPINION**

SHARON G. LEE, SP. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and JOSEPH M. TIPTON, SP. J., joined.

The issue presented in this case is whether the trial court erred in reinstating a teacher's employment after determining that her actions did not warrant her dismissal by the school board. After careful review, we affirm the judgment of the

chancery court, finding that, while the teacher's conduct on the day in question was inappropriate, her termination was not warranted.

## I. Background

On May 17, 2006, Debra R. Ripley, a tenured teacher in the Anderson County School System, was employed at Clinton Middle School. At some time on the morning of that day, one of Ms. Ripley's eighth grade reading class students came to the office of school principal Sue Voscamp and indicated that she was disturbed about the manner in which Ms. Ripley was conducting her class. Proceeding toward Ms. Ripley's classroom, Ms. Voscamp encountered Ms. Ripley, who was on her way to Ms. Voscamp's office. Ms. Voscamp described Ms. Ripley as "visibly upset," and after the two arrived at Ms. Voscamp's office, Ms. Ripley discussed medication she was taking for depression and stated that she had a doctor's appointment in that regard for the next day. At Ms. Voscamp's behest, Ms. Ripley agreed to go home for the remainder of the school day. Shortly thereafter, Ms. Voscamp advised Anderson County director of schools, V.L. Stonecipher, of the incident, and then elicited written statements from the forty students who attended Ms. Ripley's homeroom and reading classes as to what they had witnessed that morning. Ms. Voscamp also secured from Ms. Ripley's classroom a compact disc entitled "The Future" by poet and recording artist Leonard Cohen and transcribed the lyrics of the disc's title song that Ms. Ripley had played for her reading class that morning. Based upon a review of the information gathered by Ms. Voscamp, by letter dated May 19, 2006, Mr. Stonecipher notified Ms. Ripley that she was suspended without pay pending further investigation. Subsequently, by letter dated July 18, 2006, which states in pertinent part as follows, Mr. Stonecipher advised Ms. Ripley that he would recommend termination of her employment to the Anderson County Board of Education ("the Board"):

I will be recommending to the Anderson County Board of Education at its regular meeting on August 10, 2006 that you be dismissed as a teacher for the Anderson County School System as a result of your behavior on May 17, 2006, in which you exhibited violent and irrational behavior, inappropriate comments and declarations, and the presentation to students of inappropriate audio materials from a compact disk. The violent and irrational behavior consisted of you damaging some of the students' work product, throwing books and/or book packs, sitting on the floor, singing and rocking to the audio material from a compact disk, inappropriate comments and declarations to the students regarding religious, political or cultural matters, and presentation of audio material from a compact disk which was not appropriate for the age and maturity of the students to whom the material was being presented. All of this constituted conduct unbecoming to a member of the teaching profession or unprofessional conduct, incompetence, inefficiency and failure to comply with Board policies.

At Ms. Ripley's request, on January 17, 2007, the Board conducted a hearing with respect to her continued employment as a teacher in Anderson County. At this hearing, the Board was presented with evidence that included the testimony of Ms. Voscamp, Mr. Stonecipher, and Ms. Ripley; the deposition testimony of Dr. Edward Workman, a psychiatrist who evaluated and examined Ms. Ripley; the forty written statements of Ms. Ripley's students; and the lyrics of the Leonard Cohen song that Ms. Voscamp had played for her reading class. The Board voted

five-to-one to approve Mr. Stonecipher's recommendation that Ms. Ripley be dismissed. Thereupon, pursuant to Tenn. Code Ann. § 49–5–513, Ms. Ripley filed a petition for writ of certiorari in the Anderson County Chancery Court, seeking judicial review of the Board's decision. Inter alia, the petition alleged that Ms. Ripley did nothing to justify the termination of her employment, that the written statements of Ms. Ripley's students were erroneously admitted over her objection, and that the Board further erred in denying her request that her termination hearing be conducted in private. By judgment entered October 24, 2007, the trial court reversed the Board's decision, ruling that Ms. Ripley's conduct was insufficient to justify the termination of her employment as a tenured teacher, the admission of the students' written statements constituted a violation of Ms. Ripley's due process rights, and the Board's failure to grant Ms. Ripley a private hearing at her request violated her statutory right to same under Tenn.Code Ann. § 49–5–512(8). The trial court further ordered that Ms. Ripley "be reinstated to her former position with full back pay and all lost or diminished benefits." The Board appeals.

## II. Issue

The sole issue we address in this appeal is whether the trial court erred in ruling that the conduct attributed to Ms. Ripley was insufficient to justify her termination as a tenured teacher. While we acknowledge that additional issues were raised by the parties, it is our determination that these other issues are pretermitted by our decision with respect to the issue addressed.

## III. Standard of Review

Tennessee Code Annotated § 49–5–513 affords a tenured teacher whose employment has been terminated by a school board the right to chancery court review of the school board's decision. The chancery court's review, as contemplated by this statute, is a de novo review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination. *Lee v. Franklin Special Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322, 329 (Tenn.Ct.App.2007). Upon appeal to our Court in a non-jury case such as this one, we review the record de novo with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R.App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). Pursuant to Tenn.Code Ann. § 49–5–513(g), the trial court's review of the Board's decision to dismiss Ms. Ripley was "limited to the written record of the hearing before the board and any evidence or exhibits submitted at such hearing." We observe that the Board made no specific factual findings in support of its decision to terminate Ms. Ripley's employment nor did the trial court set forth any factual findings that it relied upon in determining that the Board's decision should be reversed. Given the absence of any statement of factual findings, we have conducted our own review of the record to determine the salient facts and whether the evidence supports the trial court's decision. *See Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn.2002) ("When the trial court makes no specific findings of fact, we must review the record to determine where the preponderance of the evidence lies."). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35

(Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

## IV. Grounds for Dismissal

■ As provided at Tenn.Code Ann. § 49–5–511(a)(2), a teacher may be dismissed for incompetence, inefficiency, neglect of duty, unprofessional conduct, or insubordination. Whether dismissal is warranted for any of these reasons must be determined on a case by case basis after a careful review of attendant circumstances. The Board argues that its decision in support of Ms. Ripley's dismissal is well-supported on the statutory grounds and appropriate under the circumstances. We do not agree. Based upon our review of the record and resulting factual findings recounted below, we conclude that the trial court was correct in ruling that Ms. Ripley's conduct did not warrant her dismissal.

Ms. Ripley has been a teacher in the Anderson County school system for approximately fifteen years. For many years, she has suffered from major depression, and in 1981, she obtained vocational rehabilitation funding for her college education based upon this diagnosis. Since the mid–1980's, Ms. Ripley has sought and received both psychotherapy and pharmacotherapy in an effort to address her condition. Ms. Ripley attested that although she was taking Effexor, an antidepressive medication, at the time of the incidents complained of, she was experiencing an inordinate amount of stress in her personal life, particularly as a result of difficulties she was encountering in caring for her elderly mother, and "wasn't handling it well." Realizing that she needed help, she had made an appointment with her family physician for May 12, 2006, with the expectation that he would adjust her medication to help alleviate her symptoms. However, her school's assistant principal requested that Ms. Ripley reschedule this appointment to a different date, and she agreed to do so, rescheduling the appointment to May 18.

Ms. Ripley admits that as a result of the stress she was experiencing, she was "very agitated" when she came to work on May 17. School would be out approximately one week later, on May 23, and Ms. Ripley attested that the previous week she had requested that her students take home classroom projects that had been graded, but that most students had not complied with this request. Because of a space problem in her classroom, which is agreed to be "small," Ms. Ripley also had a standing rule against bringing gym bags into the classroom. After calling roll for her homeroom, that morning, Ms. Ripley brought a large trash can into the room and, because of their size, she began breaking down the student projects that had not been taken home and disposing of them in the trash can. Ms. Ripley admits that she was angry as she did this and that she "knew [she] was in a state." While engaged in disposing of the projects, Ms. Ripley almost tripped over a gym bag that had been brought into the room by a student. Ms. Ripley tossed this gym bag out the door into the hallway. Ms. Ripley then began tossing books onto a window sill behind her desk "in an angry and aggressive way." She also attempted to throw an unopened can of soft drink into the trash, but the can hit the wall behind the trash receptacle, and as result, some of the can's contents sprayed out, apparently spattering one student.

After homeroom, Ms. Ripley held her eighth-grade reading class. Ms. Ripley attested that, as part of this class, she has the students analyze poetry, and, to that end, the preceding semester she had played the Beatles' song "Eleanor Rigby" for class discussion. However, on this

date, she played instead the Leonard Cohen song entitled "The Future,"[1] the lyrics of which were introduced in evidence.

Ms. Ripley attested that she sat on the floor next to the CD player as she played the song and turned down the volume so that her students could not hear the offensive lyrics of the first line of the second stanza. There is no proof that any student heard this line of the lyrics. Ms. Ripley further testified that the students did not have a transcription of the song's lyrics, which the students complained they were unable to understand, so she sang along with the CD and played it three times. Writing "Christ or Hiroshima," "Repent," and "Take the only tray that's left and stuff it up the hole in your culture" on the blackboard, misunderstanding the word "tree" to be "tray," Ms. Ripley told the class to write about the poem "What do you think it means? Who's the speaker?" Ms. Ripley further testified, as follows, regarding remarks she made that were precipitated by analysis and discussion of the song:

Q. What about the other matters you've been criticised [sic] for? Saying

---

1. Leonard Cohen, born 1934 in Montreal, Quebec, Canada, is a popular poet, novelist, songwriter, and singer. In 1969, his poetry earned him Canada's most prestigious literary honor, the Governor General's Award. *See* Cambridge Biographical Encyclopedia 216 (David Crystal ed. Cambridge Univ. Press 2d ed. 1998); Ira B. Nadel, *Various Positions: A Life of Leonard Cohen* 173 (Pantheon Books 1996).

The song lyrics are as follows:
Give me back my broken night
my mirrored room, my secret life
it's lonely here,
there's no one left to torture
Give me absolute control
over every living soul
And lie beside me, baby,
that's an order!
Give me crack and anal sex
Take the only tree that's left
and stuff it up the hole
in your culture
Give me back the Berlin Wall
give me Stalin and St. Paul
I've seen the future, brother:
it is murder.
Things are going to slide, slide in all directions
Won't be nothing
Nothing you can measure any more
The blizzard of the world
has crossed the threshold
and it has overturned the order of the soul
When they said REPENT REPENT
I wonder what they meant
When they said REPENT REPENT
I wonder what they meant
When they said REPENT REPENT

I wonder what they meant.
You don't know me from the wind
you never will, you never did
I'm the little [J]ew
who wrote the Bible
I've seen the nations rise and fall
I've heard their stories, heard them all
but love's the only engine of survival
Your servant here, he has been told to say it clear, to say it cold:
It's over, it ain't going any further
And now the wheels of heaven stop
you feel the devil's riding crop
Get ready for the future:
it is murder.
Things are going to slide . . .
There'll be the breaking of the ancient western code
Your private life will suddenly explode
There'll be phantoms
There'll be fires on the road
and the white man dancing
You'll see a woman
hanging upside down
her features covered by her fallen gown
and all the lousy little poets
coming round
tryin' to sound like Charlie Manson
and the white man dancin'.
Give me back the Berlin wall
Give me Stalin and St Paul
Give me Christ or give me Hiroshima
Destroy another fetus now
We don't like children anyhow
I've seen the future, baby: it is murder.
Things are going to slide . . .
When they said REPENT REPENT . . .
Leonard Cohen, *The Future* (Stranger Music, Inc. (BMI))

things about the Baptist's religion teaching through fear and fire and brimstone?

A. That was a direct result from the poem. A student had sat there, she wrote a full page, like, I asked—she came around, gave it to me, I sat and read it and I said that's good. That's exactly what I wanted. And she was disagreeing. She obviously didn't understand, it was above their level of understanding. That's why it was inappropriate and that's the only reason it was inappropriate. It was simply above their level of understanding. It's above some adult's [sic] level of understanding and obviously.

But she had written this, she said, I believe you can have Christ in Hiroshima in her paper and that's when this discussion started. I said, well, I don't know, it's kind of hard to have Christ in Hiroshima and somebody said, you know, it just—the students were discussing, they mentioned something about the war is why I responded with who would Jesus bomb.

Q. That's the context of those remarks?

A. Right.

Q. The discussion stimulated by this Cohen work.

A. Right. By the paper the student had finished.

Q. What happened then? The 17th?

A. More discussion or?

Q. No, I'm talking about any negative or unpleasantness that finally led you out the door and home that day.

A. I said, I don't believe Jesus would scare little children into believing. Some of the students agree and I said, Well, [B]aptists preach fire and brimstone. I said that almost as an afterthought. And I remember being taken back [sic] by some of the students acting offended because I even went on, I said,

well, I mean, that's part of the doctrine. I didn't mean to offend anybody. Most [B]aptists would just say yeah. Fire and brimstone, you're going to burn in hell if you're not saved. I don't see that that was anything wrong with that. I was even a little surprised when people acted offended. There was only a couple, actually, and one little girl said, well, that's not true .... she was very outspoken so she said, that's not true. I'm a Baptist.... I said, well I was raised a Baptist and it is part of the doctrine.... Well, she then said, don't talk about my mama's religion and she walked out of the room and went to the office.

As we have stated, the Board's contention that Ms. Ripley's dismissal is proper under Tenn.Code Ann. § 49–5–511(a)(2) is based in part upon the assertion that her actions constituted insubordination, one statutory definition of which is "[r]efusal or continued failure to obey the school laws of Tennessee, or to comply with the rules and regulations of the board...." Tenn.Code Ann. § 49–5–501(7). In this respect, the Board charges that Ms. Ripley's playing of the Cohen song and her related discussion and comments violated Anderson County education policy regarding classroom discussion of controversial issues and religious matters. Respectively, these policies, as referenced by Ms. Voscamp in her testimony before the Board, provide as follows:

The discussion of issues in the classroom which are politically, philosophically or socially controversial shall be relevant to the subject matter being taught, related to educational objectives, appropriate for the age and maturity of students, and shall not materially or substantially disrupt or threaten to disrupt the discipline of the school.

and,

Music, art, literature, or drama with a religious theme or basis is permitted as

part of the curriculum for school-sponsored activities and programs provided it is essential to the learning experience in the various fields of study and is presented objectively.

In its brief, the Board states that the Cohen song and the discussion and statements by Ms. Ripley that followed "clearly cross the line for middle school students." In accord, Ms. Voscamp attested that, in her assessment, the song was not age-appropriate for the students in Ms. Ripley's class trial and, therefore, was properly included as part of the basis for the decision of dismissal. Ms. Voscamp further testified as follows:

Q. Ms. Voscamp, not withstanding the fact that the Cohen work may be obscure, confusing, oblique, hard to understand, there's nothing wrong with discussing those kinds of works with students to challenge their minds to look at those confusing, oblique, poetic words that many authors write? I mean, that's part of the learning process, isn't it?

.     .     .     .     .

A. I think you have to consider the appropriateness of any work that you decide to use with the age of the students you're teaching.

Q. And I realize there's many people who don't like this work by Cohen, I don't care for it either, but the point I'm trying to make through you and the question I'm posing is you said it's confusing in response to Mr. Shattuck that it had political and cultural commentary that's confusing. Political is not forbidden from the classroom, is it?

A. No, that's not.

Q. What is it then that makes the confusing, political, cultural commentary of this work so offensive that it's part of the basis of terminating a tenured teacher?

A. He gives the connection in one of the statements when one of the students when she says makes the comment about George Bush about Bush and her God wouldn't do the things that George Bush is doing now.

Q. Well, a lot of people feel that way. What's wrong with that?

A. I just think it's not appropriate in this classroom for this age group and for this lesson. It was not connected to this lesson.

Q. So the teacher went off on something disconnected to today's lesson. That's not forbidden either, is it?

A. Not forbidden.

Q. Certainly wouldn't be grounds in and of itself for terminating a tenure teacher, would it?

A. I don't think I can really answer that question.

Q. You talked some about the comments that Ms. Ripley made discussing this work and the religious, cultural, and political issues and comments she made about the [B]aptists preaching fear and fire and brimstone. She putting out the idea that maybe that was not the best way to bring people to religion or God.

A. Yes.

Q. What's wrong with that? May offend some [B]aptists but aside from that what's wrong with it?

A. I just don't feel like it was appropriate for that classroom again.

Q. Why not?

A. It was not tied into the lesson, it was not what she had planned to teach that day, it was not, I think, that connected with all the everything that was going on in the classroom and her demeanor at the time, I think it was a little scary for the kids.

Q. So it wasn't the comment in and of itself but really her explosive outburst; was it not?

A. Combination, I think, of a lot of those things.

In addition to arguing the propriety of Ms. Ripley's dismissal upon grounds of insubordination, the Board also argues that as a general matter, Ms. Ripley's behavior shows that she was out of control and that such behavior demonstrated unprofessional conduct and incompetence, the latter of which, includes a "mental or emotional condition making [the] teacher unfit to instruct or associate with children...." Tenn.Code Ann. § 49–5–501(5). Finally, the Board asserts that this is not the first time Ms. Ripley has engaged in improper conduct and references an incident, occurring in 2000, in which her students at the time brought her a necklace in an attempt to make amends for their recent misbehavior. Ms. Ripley apparently tossed the necklace into the corner of the room, stating that she wanted appropriate behavior, not a necklace. The Board also notes that during a subsequent school field trip, Ms. Ripley made disparaging remarks to students about the Dollywood amusement park in Pigeon Forge, stating, among other things, that she would like to bulldoze it.

We agree that much of the criticism of Ms. Ripley's conduct is well-founded. It can hardly be disputed that, in playing and discussing the Cohen song, Ms. Ripley was delving into controversial social topics such as politics and religion. Ms. Ripley concedes that the song was inappropriate because it was above her student's level of understanding, and it is undisputed that the song was not approved by any of her superiors and was not part of her lesson plan that day. It further appears that Ms. Ripley was overbearing in expressing her personal political and religious opinions to the class, and we believe that perhaps it would have been more fitting had she devoted the time she spent stating her own points of view to encouraging debate among her students. Teachers are vitally important in the lives of children. A teacher should serve as a positive role model for her or his students and should endeavor to create a stable and nonthreatening environment that is conducive to learning, and therefore, we do not feel that a teacher properly deals with stress or frustration by angrily throwing objects such as books and book bags. Nevertheless, under the circumstances of this case, while Ms. Ripley's conduct may have called for some type of discipline, we cannot agree that her conduct warranted the drastic action of termination of her employment.

As we have noted, Ms. Ripley has taught school in Anderson County for fifteen years. Although she has suffered from chronic depression throughout her career, she has attended to this problem and has taken steps over the years to control it with medication. Her general success in that regard is evidenced by the fact that her personnel file is devoid of any adverse information, as both Ms. Voscamp and Mr. Stonecipher admitted. From our review of the record, we are persuaded that Ms. Ripley's actions on May 17 were a unique deviation from her usual behavior. While we acknowledge the two prior incidents alluded to by the Board—the necklace tossing incident in 2000 and the remarks made by Ms. Ripley on a later school field trip—we find these events to be of slight significance in the present context, given that Mr. Stonecipher himself indicated in his testimony that he accorded them little weight in deciding to recommend Ms. Ripley's dismissal and his further concession that Ms. Ripley "has a good record except for this one day (May 17)." Consistent

with this latter concession by Mr. Stonecipher, one of the student statements collected from Ms. Ripley's homeroom students records that "Ms. Ripley really is a good teacher and honestly it wasn't like her cause [sic] I have never seen her act like that." It is our determination that Ms. Ripley's misconduct on May 17 was precipitated by her depressive state, coupled with an unusual degree of stress she was experiencing as the result of factors in her personal life. The record reveals that Ms. Ripley was attempting to deal with her emotional difficulties during the time in question and shortly before May 17, had sought medical assistance, which may well have forestalled the problems that occurred on that date. Her delay in obtaining such assistance was the result of her having cooperated with the request of her superiors that she reschedule her doctor's appointment from its original date of May 12.

In support of its argument that Ms. Ripley's conduct on May 17 was sufficiently egregious to merit the vote against her, the Board references our opinion in *Ketchersid v. Rhea Co. Bd. of Educ.*, 174 S.W.3d 163 (Tenn.Ct.App.2005). We do not agree that the facts in *Ketchersid* are reasonably analogous to those in the case at bar. In *Ketchersid*, a tenured kindergarten teacher appealed the trial court's decision upholding her dismissal by the local school board, and we affirmed the trial court's ruling upon our determination that the evidence supported the trial court's findings of insubordination, incompetence, and inefficiency. However, in that case, the dismissed teacher's admissions revealed that she had disregarded her principal's directive that she not place her hands on the students under any circumstances and that she had, on occasion, either placed her hands on or slapped the faces of five of her seven students and had hit students on the head with a book. There is no evidence in the instant matter that Ms. Ripley physically attacked any of her students or that any students were harmed, and we do not agree that her actions of May 17 are co-equal with those of the dismissed teacher in *Ketchersid.*

In summary, after considering the particulars of Ms. Ripley's conduct and the extenuating circumstances of this case, we are compelled to agree with the trial court that her employment should not have been terminated and that the Board's decision to the contrary was unjustified.

### V.  Conclusion

For the reasons stated herein, the judgment of the trial court is affirmed. Costs of appeal are assessed to the appellants.