IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 10, 2024 Session

## TELI WHITE v. SHELBY COUNTY BOARD OF EDUCATION

**Appeal from the Chancery Court for Shelby County**
**No. CH-18-0953-2   Jim Kyle, Chancellor**

_____

**No. W2023-01226-COA-R3-CV**

_____

This appeal arises from the termination of a tenured schoolteacher. The trial court determined that the termination constituted an impermissible second punishment for conduct for which the schoolteacher had previously been suspended and ordered his reinstatement. Finding that the termination letter charged the schoolteacher with conduct which was not contemplated in the suspension letter, and with conduct which had not occurred at the time of the suspension, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Darrell J. O'Neal and Laura Smittick, Memphis, Tennessee, for the appellant, Teli White.

Jamie L. Morton and Kavita G. Shelat, Memphis, Tennessee, for the appellee, Shelby County Board of Education.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This appeal arises from the termination of Mr. Teli White, the appellant, by the Shelby County Board of Education ("SCBE"), the appellee, as a result of his involvement in a grade-changing incident. Mr. White was a tenured schoolteacher and the head football coach at Trezevant High School ("THS") for 10 years.

In 2016, Mr. Ronnie Mackin was serving as the principal of THS and conducted a

routine audit of student academic records. Over the course of this audit, discrepancies were discovered between certain students' report card grades and their transcript grades. Mr. Mackin immediately reported the discrepancies to SCBE. SCBE began investigating the matter and conducted an interview with Ms. Shirley Quinn, who was then serving as the records secretary at THS. Ms. Quinn was interviewed because it was determined that her access code had been used to make certain grade changes in the school's student management system which pertained to the discrepancies. This meeting resulted in Ms. Quinn being placed on administrative leave pending the outcome of the remainder of the investigation.

After Ms. Quinn's interview, SCBE decided to speak with Mr. White and other football staff members because some of the grade discrepancies involved students who were members of the THS football team. Ms. Chantay Branch, one of the primary investigators for SCBE, conducted the initial interview with Mr. White in September 2016.

At the conclusion of the meeting, Mr. White was placed on administrative leave. At this point, SCBE visited THS, confiscated Mr. White's computer, and found physical evidence which contradicted statements he made during the interview. These items included photographs of Mr. White on recruiting visits with THS student athletes. Mr. White's computer was analyzed and approximately ten student transcripts were discovered, eight of which belonged to student athletes. An email from Ms. Quinn to Mr. White was also located in which she stated she had placed student transcripts in his box. The binder containing student progress reports was never located.

In October 2016, Ms. Chantay Branch sent Mr. White a letter charging him with the breach of SCBE policies and informing him he would be suspended for five days. This letter contained charges for violation of Board Policy number 6051 (Interscholastic Athletics) and for conduct unbecoming to a member of the teaching profession, as defined in Tennessee Code Annotated section 49-5-501. Specifically, the letter charged Mr. White with having "intentionally misled District representatives during its investigation regarding the extent of [his] involvement in maintaining control of the Trezevant High School interscholastic football program." The letter further stated that, contrary to his statements during the initial interview, Mr. White was found to have "played an intricate role in supporting the recruitment of Trezevant High School student-athletes." The letter also stated that Mr. White possessed student transcripts which had been altered, despite his contentions that he routinely monitored student athlete academic progress. The letter further charged Mr. White with having conducted school football-related business from an unauthorized email account. The letter informed Mr. White that he would be suspended from October 24, 2016, through October 28, 2016. SBCE then launched a more comprehensive investigation into the incident.

After returning to THS, Mr. White and Mr. Mackin had various conflicts culminating in a disagreement over the livestreaming of a student athlete's signing day

ceremony. After that incident, Mr. Mackin sent Mr. White back to Ms. Branch's office to be disciplined for causing embarrassment to the school, the school district, and Mr. Mackin. Mr. White was then reassigned from Trezevant High School to Melrose High School to serve as head football coach; however, he never reported to that assignment.

At some point, SCBE decided to hire outside counsel to perform a more comprehensive investigation of the grade changing issues. The Butler Snow law firm was one of three firms retained to perform this investigation.[1] In preparation for this external investigation, Mr. Michael Woods, a labor relations advisor for SCBE and a member of the original investigative team, was instructed to assemble some data from the original investigation to provide to the Butler Snow investigators. Mr. Woods experienced a technical difficulty while exporting data to an external hard drive, and an information technology employee was tasked with assisting him. While doing so, the IT employee alerted Mr. Woods of the existence of additional files on Mr. White's computer. The additional files were located in a folder titled "My Pictures" and many reflected the names of various THS students.[2] Mr. Woods informed Ms. Branch of the newly-discovered files and wrote a memorandum documenting the findings. The data was turned over to outside counsel for review.

Members of the external investigative team met with Mr. White twice, once on August 14, 2017, and once on August 23, 2017. After the interviews, the investigators generated memorandums outlining the issues discussed in each interview. The memorandum generated at the conclusion of the interviews contains summaries of the interview's discussion of several individual students' transcripts which were located on Mr. White's computer, and which either evidenced Mr. White's calculations made for purposes of determining NCAA eligibility or grade changes, some of which occurred two years after the completion of the class. The investigators also hired a forensic accountant to generate spreadsheets which tracked grade changes.

SCBE then determined enough information was present to pursue Mr. White's termination. A termination letter with written charges was provided to Mr. White pursuant to Tennessee Code Annotated section 49-5-511 on December 5, 2017. The letter charged Mr. White with both conduct unbecoming to a member of the teaching profession pursuant to Tennessee Code Annotated section 49-5-501(3) and neglect of duty pursuant to Tennessee Code Annotated section 49-5-501(8). The letter also outlined applicable SCBE policies which had been violated, including policy numbers: 4002 (Staff Ethics), 5015 (Grading System for Grades 6-12), and 6051 (Interscholastic Athletics). The letter also

---

[1] Testimony indicated that SCBE retained three law firms to investigate the grade changing issues. The only firm referenced in the record and in this opinion is the Butler Snow law firm.

[2] It is not discussed in the briefs, but it does not appear that Mr. White took any forensic measures to hide data or delete files from his computer. He merely stored files in the "My Pictures" folder of his computer rather than the "My Documents" or "Desktop" folders of his computer and the "My Pictures" folder was not searched for evidence prior to the 2016 suspension.

contained a description of the actions supporting the charges levied against Mr. White. Specifically, the letter listed the following acts which supported a finding Mr. White engaged in conduct unbecoming to a member of the teaching profession: (1) from 2012-2016 Mr. White either altered or assisted in altering transcript grades of members of the Trezevant football team, (2) in 2016 Mr. White provided false statements and failed to be forthcoming during the initial investigation conducted by SCBE, (3) in June 2017 Mr. White provided false statements and failed to be forthcoming during an investigation conducted by external investigators, and (4) Mr. White's dishonesty during each of the 2016 and 2017 investigations and his involvement in the THS grading improprieties evidenced a disregard for the teaching code of ethics. To support the charge of neglect of duty, the letter stated that Mr. White failed to perform duties and responsibilities expected of a person serving in his capacity and this was evidenced by his decision to either award or facilitate the award of academic credit to students not related to student performance. The letter was signed by the school superintendent and concluded: "Based on the foregoing [c]harges, individually and/or collectively, I recommend the dismissal of Teli White from employment with Shelby County Schools."

Mr. White requested a hearing before an impartial hearing officer to review his termination pursuant to Tennessee Code Annotated section 49-5-512(a). At that hearing, testimony was presented by Ms. Chantay Branch; Mr. Michael Woods; Mr. Stephen Parker, an attorney at the Butler Snow law firm; Mr. Ronnie Mackin; Mr. White; and others. They all testified regarding events surrounding Mr. White's suspension, the investigation, and his ultimate termination.

Ms. Chantay Branch testified regarding the events of the initial interview conducted with Mr. White in September 2016. She stated that in the interview they discussed: the grade changes made to transcripts of THS football team members, the process through which Mr. White would monitor THS football team members' weekly academic progress, Mr. White's involvement in the recruitment of THS football team members by college athletic programs, and Mr. White's involvement in the NCAA Clearinghouse process.[3] Ms. Branch further stated that over the course of the interview Mr. White claimed he was not involved in the student athlete recruiting process, he was not involved in the NCAA Clearinghouse process, he was not involved in any student grade changes not pertaining to classes he taught, and he did not direct others to make any improper grade changes. Ms. Branch also stated that Mr. White indicated he had a process in which he would monitor football team member grades weekly to ensure good academic standing. She stated that Mr. White told her that he kept a binder in his office which contained progress reports generated from his own weekly monitoring of football team members' academic standing prior to each game played.

---

[3] The NCAA Clearinghouse process refers to the submission of student athletes' academic records and register so they may be considered for recruitment.

Mr. Michael Woods testified that he experienced technical difficulty while he was assembling data from the original investigation to provide to the Butler Snow investigators. He stated that an IT employee who assisted him alerted him to of the existence of additional files on Mr. White's computer which were located in a folder titled "My Pictures." Many of those files reflected the names of various THS students. Mr. Woods stated he noticed files which held the names of students which he recognized as having been discussed during the initial investigation. Mr. Woods stated that, when he opened a file labeled with one of the names he recognized, he found that it contained a transcript with a GPA of 2.20. Mr. Woods stated he then opened another file bearing the same student's name and this file also contained a transcript, but this transcript reflected a GPA of 2.33. Mr. Woods stated when viewing the "properties" of these files and one additional file with this student's name, investigators found they were saved to Mr. White's computer on September 17, 2012; November 29, 2012; and November 30, 2012, and each contained a transcript listing a different and increasing GPA.

Mr. Stephen Parker, a member of the Butler Snow investigative team, testified regarding the findings of the external investigation. Mr. Parker stated the team asked Mr. White about his involvement in the student athlete recruiting process during the August 2017 interviews, to which Mr. White stated that he had very minimal involvement. He also testified that Mr. White stated he never tracked or calculated students' eligibility. Mr. Parker stated that Mr. White was then asked specifically whether he would sit down with students to go over their transcripts and that he stated that he never reviewed a student's transcript to determine NCAA eligibility. Mr. Parker then stated they went over these points several times, as the statements contradicted both the files which had been discovered on Mr. White's computer and the fact that Mr. White had been openly running his progress report program at the school for many years.

Mr. Parker also stated that the investigators questioned Mr. White several times during the interview regarding handwritten notes present on some of the transcripts which appeared to be calculations made using certain student academic information. Mr. Parker stated that they asked Mr. White whether he performed the calculations and that he denied doing so several times, but he eventually admitted that the handwriting was his. Mr. Parker testified that the three investigators concluded that Mr. White "had been absolutely untruthful during the first interview and in the morning of the second interview."

During cross-examination, Mr. Parker was questioned regarding the transcripts of a specific student. He explained the circumstantial evidence which he believed indicated that Mr. White was involved with grade changes to this student's transcript and the process the team determined was used to change grades. Mr. Parker stated that when the investigators would examine a spreadsheet containing the grade changes, they would look at the date and time the student's transcript grade was changed using Ms. Quinn's access number. Then they would look at the date and time that the student's transcript was scanned to Mr. White's computer. The time the transcript was scanned to Mr. White would

be shortly after the grade change had been made. After the transcript was scanned to Mr. White, another grade change would be made using Ms. Quinn's access number which increased the student's GPA. Then, the new transcript would again be scanned to Mr. White's computer, and this happened multiple times. Mr. Parker indicated this was substantial circumstantial evidence which indicated that when Ms. Quinn would provide Mr. White with a transcript which did not meet NCAA eligibility, Mr. White would make certain score calculations and Ms. Quinn would be informed of the results and make grade changes. Then, Ms. Quinn would return the transcript to Mr. White for additional calculations to be performed, and this process would repeat until the student was NCAA-eligible. Mr. Parker stated that, from the view of the investigators, the only person at THS who would know what grades an athlete needed for purposes of NCAA eligibility would have been Mr. White. Mr. Parker also stated the investigation found that a pattern existed regarding the grade changes and "it would have had to have been condoned by administration, principal, vice principal, all that."

Mr. White testified regarding meetings during the initial SCBE investigation which occurred in 2016. Mr. White claimed that during one interview, Ms. Branch accused him of lying to investigators about recruiting. Mr. White stated that he told her he "never once lied about [] recruiting" and that the questions asked of him pertained to a single recruiting trip with a single student which he did not attend, but that he never denied going on other recruiting trips. He also stated that he was informed that the issues would be reported to TSSAA for the investigation of student athlete eligibility and the validity of a championship won by THS. Mr. White stated at the end of the final meeting that he was told that there was no evidence directly linking him to grade changes or proving that he directed the secretary to change grades, but that he would be suspended for five days for ethics as the grade changes "happened under [his] watch."

Mr. White went on to testify that he had informed his superiors that he did not wish to return to THS after his suspension, and that he only agreed to do so after a meeting with Mr. Mackin and other SCBE personnel. Following his return, Mr. White stated that he told Mr. Mackin that he did not want to be involved in the livestreaming of a student athlete's signing day ceremony because his previous suspension had been for alleged recruiting violations. After that incident, Mr. White stated that Ms. Branch told him not to return to work until they could find him a new school assignment. Mr. White admitted that he never reported to the new assignment at Melrose High School.

At the conclusion of the hearing, the hearing officer determined that SCBE established by a preponderance of the evidence that Mr. White was either involved in or was aware of improper changes to student transcript grades. The hearing officer concluded that Mr. White's behavior constituted conduct unbecoming to a member of the teaching profession and neglect of duty. Accordingly, the hearing officer upheld Mr. White's termination. Mr. White appealed the hearing officer's decision and sought a hearing before SCBE in accordance with Tennessee Code Annotated section 49-5-512. SCBE heard the

matter on June 6, 2018, and after reviewing the record, a majority of the members of SCBE voted to sustain the hearing officer's decision, officially terminating Mr. White's employment.

On June 27, 2018, Mr. White submitted a "verified petition for writ of judicial review" to the Shelby County Chancery Court. Mr. White sought permission to file an amended petition on July 19, 2019, which was granted on August 7, 2019. The amended petition was filed on August 15, 2019 and sought the reversal of the SCBE decision to terminate Mr. White because: (1) no policy allowed for him to be punished a second time for conduct he had previously been suspended for, (2) the determination to fire him contradicted testimony of Ms. Branch that there was no evidence Mr. White changed or directed another to change grades, and (3) SCBE failed to meet its burden and prove its charges. Mr. White sought reinstatement to his teaching position and backpay. In a later-filed memorandum in support of his amended petition, Mr. White made two additional claims. First, he claimed that an investigation conducted by the Tennessee Secondary School Athletic Association ("TSSAA") found no evidence any THS players were ineligible and therefore SCBE was unable to fire him. Second, he claimed that he was treated unfairly when he was terminated while another SCBE employee involved in a grade-changing incident was only demoted.

On December 17, 2019, the trial court made an oral ruling regarding Mr. White's petition without allowing an opportunity for counsel for either party to present argument. The trial court found that Mr. White's termination was a second punishment "for essentially the same offense - - same situation." The trial court stated it would order SCBE "to reinstate Mr. White to a position comparable to what he had at the time of his suspension." The court also stated that it would not award either attorney's fees or back pay to Mr. White. A written order was not entered at that time, and the trial court directed the parties to draft orders for its consideration. Despite this, the trial court stated that it intended the reinstatement to go into effect by the start of the upcoming semester, beginning January 2020.

A written order was entered on January 21, 2020, officially granting Mr. White's amended petition for writ of judicial review. The trial court restated its oral determination that Mr. White's termination was an impermissible second punishment "based on substantially the same facts and allegations" which resulted in his suspension. The order stated that Mr. White was to be reinstated to a position comparable to the one from which he had been dismissed but declined to award backpay or attorney's fees. On February 17, 2020, Mr. White filed a motion to alter or amend the trial court's judgment seeking an award of backpay. SCBE responded to the motion by requesting that the trial court deny Mr. White's backpay request and amend the judgment in favor of SCBE on the merits. On September 29, 2020, after considering the motions, the trial court vacated the January 21, 2020, order in its entirety, and ordered the parties to mediation.

The parties attended mediation and no issues were resolved.  On March 8, 2021, the trial court entered an order remanding the matter back to SCBE for a new teacher tenure hearing which would "not be limited in scope to a particular topic but [was to] be a new hearing on the merits of Mr. White's termination pursuant to the Teacher Tenure Act."

On April 5, 2021, SCBE appealed to this Court. *See White v. Shelby Cnty. Bd. of Educ.*, No. W2020-00278-COA-R3-CV, 2022 WL 842597, at *4 (Tenn. Ct. App. Mar. 22, 2022).  We determined that the trial court failed to conduct the required de novo review of SCBE's record and failed to make findings which would justify the remand of the case to SCBE. *Id.*  Accordingly, we vacated the trial court's order remanding the case to the school board and remanded the matter to the trial court for further proceedings. *Id.* at 5.

On remand, the trial court entered a new order granting Mr. White's amended petition for writ of judicial review on August 3, 2023.  The trial court determined that the evidence indicated that Mr. White engaged in conduct unbecoming to a member of the teaching profession and that SCBE's initial punishment was supported by the evidence.  However, the trial court also found that Mr. White was disciplined twice for the same conduct.  The trial court stated, "all of the charges against White stem from the same common nucleus of facts/allegations that somehow White engaged in modifying student athletes' transcripts and was allegedly not truthful during investigations."  The trial court further stated that Mr. White's testimony never changed during the investigation, and it was unclear how the second set of charges for lying were new when Mr. White's testimony never changed.

The trial court also discussed the 2016 suspension letter written by Ms. Branch which informed Mr. White of his suspension.  The trial court stated quotes from the letter indicated Mr. White was suspended for making false statements, and stated he knew or should have known about the altered student transcripts.  The trial court specifically pointed to certain portions of the letter which stated, "clearly show White was suspended for making false statements and was either involved in or knew or should have known about the altered student transcripts."  The trial court also reviewed the confidential investigation report prepared by Ms. Branch on October 27, 2016.  The trial court stated that when overlaying the investigation report with the suspension letter it was "obvious that White had been disciplined for conduct that occurred from 2012-2016."

The trial court further stated, "there was no new evidence that warranted additional discipline of White."  The trial court cited Ms. Branch's testimony that when Mr. White was suspended there was no direct evidence linking him to any grade changes.  The trial court also referenced testimony stating that at the time of the suspension, Mr. White had ten (10) transcripts on his computer and an email from Ms. Quinn, and the same information was present when Mr. White was terminated.  The trial court also stated that it was unclear how SCBE could have discovered new evidence in the time between the suspension and the termination, as the computer had been in their possession the entire

time.  The trial court stated that even if SCBE did find new evidence on the computer after the 2016 suspension, then "they knew or should have known about the contents" and the previous discipline could not "be resurrected and used in the absence of" new evidence.

Finally, the trial court found that Tennessee law prohibits a tenured teacher from being punished twice for the same offense.  The trial court determined that Mr. White had been disciplined twice for the same conduct and that SCBE regretted only suspending Mr. White and sought to correct its mistake.  The trial court reversed the termination and ordered Mr. White reinstated to his former position or a similar position with SCBE beginning with the Fall 2023 semester.  The trial court further stated that because the first punishment was supported by facts, it would not award Mr. White back-pay or attorney's fees.  Subsequently, Mr. White filed this appeal.

## II. Issues Presented

Mr. White presented the following issues on appeal which we have slightly reframed:

1. Whether the trial court erred when it reinstated Mr. White but declined to award him backpay.
2. If the trial court erred when it reinstated Mr. White, then whether the matter should be remanded to the chancery court to determine whether the appellant's equal protection rights were violated.
3. If the trial court erred when it reinstated Mr. White, then whether the matter should be remanded to the chancery court to determine whether the appellee was bound by the findings of the Tennessee Secondary School Athletic Association's investigation.

In addition to answering Mr. White's issues, SCBE raised the following issue on appeal, which we have slightly reframed:

1. Whether the trial court erred when it determined Mr. White's termination was an impermissible second punishment for conduct for which he had previously been suspended and ordered his reinstatement.

For the following reasons, we reverse.

## III. Discussion

### A. Standard of Review

A tenured schoolteacher who has been terminated from his or her employment by a school board has "the right to judicial review of the school board's decision" pursuant to Tennessee Code Annotated section 49-5-513 (2012).  *Emory v. Memphis City Sch. Bd. of*

*Educ.*, 514 S.W.3d 129, 139-40 (Tenn. 2017).  The teacher may seek this review by filing a "petition for writ of certiorari from the chancery court of the county where the teacher is employed."  Tenn. Code Ann. § 49-5-513(a).  During such review, a chancery court is permitted "to address the intrinsic correctness of the school board's decision." *Emory*, 514 S.W.3d at 141.  The chancery court's review of these matters, "' is a *de novo* review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination.'" *Id.* at 141-42 (quoting *Ripley v. Anderson Cnty. Bd. of Educ.*, 293 S.W.3d 154, 156 (Tenn. Ct. App. 2008)).  The chancery court's review "is limited to the record of the school board proceedings." *Id.* at 142.  "New evidence is only admissible 'to establish arbitrary or capricious action or violation of statutory or constitutional rights by the board.'" *Id.* at 142 (quoting Tenn. Code Ann. § 49-5-513(g)).

If a party is dissatisfied with the decision of the chancery court, they "may appeal as provided by the Tennessee rules of appellate procedure, where the cause shall be heard on the transcript of the record from the chancery court."  Tenn. Code Ann. § 49-5-513(i).  An appellate court's review of the chancery proceedings is conducted pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure, "to determine whether the evidence preponderates in favor of the chancery court's findings of fact." *Emory,* 514 S.W.3d at 142 (citing *Ripley*, 293 S.W.3d at 156).  Issues of law "are reviewed *de novo*, with no presumption of correctness in the chancery court's conclusions." *Id.* (citing *Ripley*, 293 S.W.3d at 156).

## B. Whether the trial court erred when it determined Mr. White's termination was an impermissible second punishment for conduct for which he had previously been suspended and ordered his reinstatement.

As its resolution will be dispositive on several issues, we first consider the issue presented by Appellee.  SCBE argues that the trial court correctly found that Mr. White engaged in conduct unbecoming to a member of the teaching profession and that his punishment was supported by the evidence, but erred when it determined that he was disciplined twice for the same behavior.

We have previously held that "principles of fundamental fairness and the fact that a civil service employee. . . can only be terminated for cause. . . demonstrates to us that such an employee should not be punished twice for the same conduct." *Cope v. Tennessee Civ. Serv. Comm'n*, No. M2008-01229-COA-R3-CV, 2009 WL 1635140, at *6 (Tenn. Ct. App. June 10, 2009). In *Cope*, we ultimately found that a previously-written memorandum regarding an employee's problematic patterns of behavior did not constitute a disciplinary action and thus his termination was not an impermissible second punishment. *Id.* at *8. We have previously applied the rule from *Cope* in a case involving a tenured schoolteacher. *See Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 687-88 (Tenn. Ct.

App. 2018) (finding a written reprimand for an earlier incident in which a teacher engaged in unprofessional conduct did not constitute a disciplinary action and thus the incident was permitted to serve as grounds for dismissal based on unprofessional conduct). As both cases involve employees who were not impermissibly punished twice based on findings that the initial punitive actions which were alleged to be punishment did not constitute punishment, they are not helpful here as Mr. White's suspension clearly constituted punishment.

However, we also applied this rule in a matter more factually similar to the one at hand in *Echols v. City of Memphis*, No. W2013-00410-COA-R3-CV, 2013 WL 5230251 (Tenn. Ct. App. Sept. 16, 2013). In *Echols*, a police officer working for the City of Memphis Police Department was terminated from his employment based on his involvement in a private security company, Peace Security, in violation of MPD policy and for making statements which were "less than candid" over the course of the departmental investigation. *Id.* at *1. Sergeant Echols appealed that decision to this court and raised an issue similar to the one raised by Mr. White. *Id.* at *4. Prior to his termination for his involvement in Peace Security, "Sergeant Echols had been suspended on three previous occasions based on his involvement with various security companies." *Id.* At the time that he was called in and questioned regarding his involvement with Peace Security, Sergeant Echols was still serving a suspension for his involvement in a separate private security company called T-Tech. *Id.* Notably, the involvement with the Peace Security firm occurred approximately two years prior to his suspension for involvement with T-Tech. *Id.* Sergeant Echols argued that he could only be punished once for his conduct as his termination was based on the same conduct he had been suspended for, and the events leading to the termination occurred prior to the events leading to the suspension. *Id.* at *5.

Sergeant Echols' suspension and his termination were based on his involvement in separate companies and involved separate circumstances. *Id.* There was nothing in the record indicating that Sergeant Echols informed his superiors of his involvement in Peace Security at the time he was suspended for his involvement in T-Tech, and there was no mention of Peace Security in the disciplinary record of the suspension. *Id.* Thus, even though Sergeant Echols did not commit any new offenses between the time he was suspended and the time he was terminated, it was still permissible for him to receive punishment for conduct based on events which were "separate and distinct" and "it [was] obvious that Sergeant Echols was not impermissibly 'disciplined twice for the same event,' as discussed in *Cope*." Punishment for his involvement in T-Tech did not constitute punishment for his involvement in Peace Security, even though the involvement with Peace Security occurred prior to the suspension. *Id.* Thus, we found it did not "offend the concept of 'fundamental fairness' to discipline Sergeant Echols twice" as one punishment contemplated one instance of conduct and the other punishment contemplated another instance of conduct. *Id.*

In the same way that Sergeant Echols' involvement with Peace Security was

separate from his involvement with T-Tech, dishonesty with SCBE is clearly a separate instance of conduct from dishonesty with Butler Snow investigators, as the dishonesty occurred months prior, and involved a separate set of investigators asking a separate set of questions. Accordingly, SCBE's decision to punish Mr. White separately for a separate instance of conduct would not offend the "principles of fundamental fairness" which were informative to the *Cope* court. *Cope*, 2009 WL 1635140, at *6.

The trial court determined that Mr. White engaged in conduct unbecoming to a member of the teaching profession pursuant to Tennessee Code Annotated section 49-5-501. However, the trial court also determined that the conduct resulting in the charges levied against Mr. White in the December 2017 termination letter was based on the same conduct for which he had been suspended in October 2016. Accordingly, the trial court determined, pursuant to *Cope,* that Mr. White's termination was an impermissible second punishment for conduct for which he had previously been disciplined. *Cope*, 2009 WL 1635140, at *6. The trial court provided two contentions supporting its finding that the conduct Mr. White was terminated for was the same conduct for which he had been suspended.

First, the trial court found there was no new evidence discovered after the 2016 suspension which would have warranted additional discipline of Mr. White. The trial court stated it was unclear "how new information could [have been] discovered" on Mr. White's computer after the 2016 suspension as the computer had been in SCBE's possession since the search of Mr. White's office. Thus Mr. White could not have added or deleted any files. The trial court also stated that even if SCBE did discover new evidence on the computer after the suspension, the evidence could not serve as the basis for additional discipline as SCBE should have known the evidence existed at the time of the suspension. Second, the trial court determined "all of the charges against White stem from the same common nucleus of facts/allegations." Thus, it was "not clear" to the trial court how the second set of charges for dishonesty could have been "new when his testimony [had] never changed."

SCBE claims that the trial court erred when it determined that no new evidence implicating Mr. White was available at the time of the 2017 termination, and that even if there was no new evidence, Mr. White's termination was justified based on his dishonesty during the Butler Snow investigation which occurred after his 2016 suspension and was not based on any new evidence. SCBE further asserts that the trial court erred when it determined Mr. White was punished twice for the same conduct.

First, SCBE argues that new evidence served as the basis for charges contained in the 2017 termination letter which were not contemplated in the 2016 suspension letter. SCBE states that the 2016 suspension letter did not charge Mr. White with altering or assisting in altering student transcripts, as the letter only states he possessed altered transcripts. SCBE claims that when the additional files were discovered and analyzed, they

led to the conclusion that Mr. White was personally involved in fraudulent grade changes. Thus, Mr. White was terminated for misconduct unknown to SCBE at the time of the 2016 suspension.

Second, SCBE argues Mr. White's termination was based in part on his dishonesty during the August 2017 Butler Snow investigation. SCBE asserts that Mr. White's 2016 suspension could not have been punishment for dishonesty which did not occur until 2017. SCBE further claims that Mr. White's dishonesty during the Butler Snow investigation constituted "separate and distinct actions" from those which resulted in his suspension. SCBE asserts the trial court used an incorrect standard when it used a "common nucleus of facts/allegations" standard to determine both the 2016 suspension and 2017 termination were based on the same conduct. SCBE argues that the scope of behavior for which an employee has been punished is narrower and is reserved for individual actions or instances of conduct.

SCBE argues that Mr. White may also be punished for conduct similar to separate conduct that he was previously suspended for, including conduct which occurred prior to the suspension but was unknown to SCBE at the time. SCBE further contends that, just as the City in *Echols* was unaware of certain misconduct at the time of the officer's initial suspension, SCBE was unaware of: (1) Mr. White's dishonesty with the Butler Snow investigators in 2017 (as it had not yet occurred) and (2) Mr. White's personal involvement in the fraudulent alterations to the transcript grades of THS students. SCBE argues that both charges were contained only in the termination letter, and just as the officer in *Echols* was not granted a "free pass" for undiscovered misconduct when he received a 60-day suspension, Mr. White was not immune from punishment for undiscovered misconduct when he was suspended. *Echols*, 2013 WL 5230251, at *5.

Conversely, Mr. White asserts that the trial court was correct when it determined that he was punished twice for the same conduct. Mr. White points to the findings of fact enumerated by the trial court and the comparison made between the facts included in the 2016 suspension letter and the 2017 termination letter. Mr. White also states that his conduct over the course of these events should be viewed comprehensively as there are no separate incidents or events, only one large set of factual circumstances as the charges "stem from the same alleged grade changes involving the same ten transcripts and one email." Finally, Mr. White argues even if there was new evidence discovered, it is irrelevant as the termination would still be an impermissible second punishment for the same conduct he was previously suspended for.

There was certainly evidence considered at the time of the December 2017 termination which was not considered at the time of the October 2016 suspension. The record indicates that additional files were discovered in a portion of Mr. White's computer which had not yet been accessed as SCBE was preparing to turn the investigation over to the Butler Snow team. The conclusions and evidence of the Butler Snow investigation

were also available at the time of the 2017 termination, including the results of Mr. White's interview, the spreadsheets displaying grade changes, and the files containing transcripts with Mr. White's calculations affixed to them. However, the trial court's determination that any evidence found on Mr. White's computer after the 2016 suspension could not serve as the basis of a new punishment does call into question whether the newly discovered evidence should have been considered in the termination as it was in the possession of SCBE from the time it confiscated the computer in 2016.

It is impossible for Mr. White to have been disciplined for dishonesty with the Butler Snow investigators by the 2016 suspension. The interviews conducted by Butler Snow investigators in which he was found to have been dishonest did not occur until August 2017, several months after the suspension had concluded in October 2016. Mr. White and the trial court seem to believe that because Mr. White told the same story to both the SCBE investigators and the Butler Snow investigators, that dishonesty with investigators constitutes one large piece of conduct. Therefore, they conclude that the 2016 suspension effectively served as punishment for any dishonesty which may have occurred throughout the entire investigation, including dishonesty which occurred after the suspension.[4] We disagree.

The termination letter lists Mr. White's dishonesty with Butler Snow investigators during the 2017 investigation as actions which constituted conduct unbecoming to a member of the teaching profession, warranting his dismissal. Mr. White was found to have been dishonest with a different set of investigators, who asked a different set of questions, and who were performing a broader investigation than in 2016. To determine that Mr. White was immune from any punishment for dishonesty with Butler Snow investigators because he had already been dishonest with SCBE investigators would lead to an untenable result. The holding in *Cope,* that a public employee should not be punished twice for the same conduct, was predicated on "principles of fundamental fairness." *Cope*, 2009 WL 1635140, at *6. Mr. White being terminated for acts of dishonesty which occurred after his 2016 suspension is not fundamentally unfair and thus does not run afoul of this standard. *See Echols*, 2013 WL 5230251, at *5 (finding the punishment of a police officer for conduct similar to that for which he had previously been suspended did "not offend the concept of 'fundamental fairness'" where the events leading to the punishments were "separate and distinct").

Further, we have previously stated that where a public employee could not be punished twice for the same conduct, the conduct could still be considered when formulating a proper punishment for a new offense. *See Finney v. Franklin Special Sch.*

---

[4] The trial court stated that "all of the charges against White stem from the same common nucleus of facts/allegations" when determining that the conduct contemplated in the suspension letter was also contemplated in the termination letter. The trial court provided no authority in which a similar standard has been used for these purposes, and we have found none.

*Dist. Bd. of Educ.*, 576 S.W.3d 663, 689-90 (Tenn. Ct. App. 2018) (determining that a tenured schoolteacher's restraint of a special education student in the school hallway could not serve as the grounds for her later termination as she had already been punished by a three-day suspension for the incident[5], but "her conduct on this and other occasions [could] be considered when determining the appropriate disciplinary action" for a later incident). In the present case, there are several matters to consider in determining the appropriate punishment. These include Mr. White's suspension for dishonesty with SCBE investigators regarding his role in student athlete recruitment and general dishonesty during the interview with Butler Snow investigators, the additional files located on his computer, Butler Snow's conclusion that he directed Ms. Quinn to make changes to student transcripts, and SCBE's finding that Mr. White neglected his duty as a teacher.

Each of these facts support SCBE's decision to terminate Mr. White based on the charges contained in the termination letter which were not contemplated during the 2016 suspension. Regardless of whether the charges pertaining to the altering of transcripts could stand on their own as a basis of dismissal, they and all the other events may be considered when determining the appropriate punishment for those things which were certainly not considered in the 2016 suspension. Specifically relevant is Mr. White's dishonesty with Butler Snow investigators which occurred several months after the 2016 suspension. When considering these events, SCBE's decision to terminate Mr. White "[b]ased on the foregoing charges, individually and/or collectively" is supported by the record.

Therefore, we find that SCBE's termination of Mr. White did not constitute a second punishment for conduct for which he had previously been suspended. Accordingly, we reverse the trial court's decision to reinstate him. Further, we find SCBE's decision to terminate Mr. White was supported by the evidence contained in the record. Accordingly, we affirm SCBE's disciplinary decision to terminate Mr. White as a tenured teacher.

### C. Whether the trial court erred when it reinstated Mr. White but declined to award him backpay.

Having determined that Mr. White will no longer be reinstated, the issue of whether he should have been awarded backpay is pretermitted.

### D. If the trial court erred when it reinstated Mr. White, then whether the matter should be remanded to the chancery court to determine whether the appellant's equal protection rights were violated.

---

[5] Tennessee Code Annotated section 49-5-512(d) has specific rules for suspensions of three-days or less which are not made in anticipation of dismissal and that in such cases, "[t]he director may not impose any additional punishment beyond that described in the notice of suspension." Tenn. Code Ann. 49-5-512(d)(4). This portion of the *Finney* opinion is separate from that which applied the *Cope* standard.

Mr. White argues that this matter should be remanded to the trial court to determine whether his equal protection rights were violated when SCBE disciplined him more harshly than a similarly situated female principal. Mr. White claims he suffered disparate treatment when SCBE terminated him for his involvement in a grade -changing incident, despite lacking direct evidence of his involvement, but only demoted the female principal of another school for her involvement in a grade changing incident in which the principal admitted providing the password to her administrative account to another employee to change student grades. In his brief, Mr. White asserts (1) Mr. White, and the female principal were similarly situated individuals in their capacities as members of school administration, (2) they were each punished for similar acts, and (3) Mr. White was treated more harshly than the female principal on the basis of gender.

We must first determine whether the issue was properly raised and is therefore eligible for consideration on remand. We have held that an employee appearing before a county civil service merit board was not required to raise a constitutional equal protection argument before the board, even if the board had the authority to consider the issue. *Cnty. of Shelby v. Tompkins*, 241 S.W.3d 500, 508 (Tenn. Ct. App. 2007) (citing *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 457 (Tenn. 1995) (additional citations omitted). However, we explained that the employee must raise the issue "at the chancery level or waive it." *Id.* (citing *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

In *Tompkins*, we determined that a public employee failed to properly raise an equal protection argument at the chancery court level and failure to do so resulted in the issue being waived. *Id.* at 509-10. There, "nothing pertinent to a constitutional argument appear[ed] in the lower court filings" and counsel "made no affirmative statements regarding this issue to the lower court." *Id.* at 508. Mr. White's equal protection claim faces similar issues.

Here, the issue of equal protection was not addressed before the impartial hearing officer. The issue was also not raised in the initial petition for judicial review filed by Mr. White in chancery court. The issue was referenced for the first time in a memorandum in support of Mr. White's amended petition for judicial review. Mr. White stated in the amended petition that the issue was not raised until that filing because the female principal was not disciplined until after Mr. White's hearing had occurred and the original petition had been filed. However, the issue was not framed as an equal protection claim in the memorandum and did not contain the other necessary components of an equal protection claim. Further, none of the transcripts of proceedings before the chancery court contain references to an equal protection argument. There is also no explicit reference to an equal protection claim in the memorandum itself. The allegations contained in the memorandum appear to support the more general argument that Mr. White was treated unfairly by the school board because he was disciplined more harshly than another employee. The memorandum does not contain any allegation that the gender or other classification of the

parties was the basis for any disparate treatment. The memorandum really alleges that the more lenient treatment of the female principal, despite what Mr. White claims was more conclusive evidence of her involvement in a grade changing scandal, was simply unfair.

The argument in chancery court was based solely on the alleged disparate treatment of Mr. White, not any membership in a suspect class. We have previously considered arguments from public employees alleging disparate treatment not based on membership in a protected class. *Echols*, 2013 WL 5230251, at *2-3. In *Echols* we considered a case in which a police officer was terminated for his involvement in third-party policing agencies. *Id*. at *1. The officer attempted to introduce evidence showing he received harsher punishment than another officer disciplined for similar conduct. *Id*. at *3. The officer did not suggest that he was a member of a suspect class or that any disparate treatment was based on membership in a suspect class, only that he was treated differently than the other officer for no discernable reason. *Id*. We stated, "[t]his was not a cognizable claim under the Equal Protection Clause." *Id*. We further opined the police officer's "equal protection claim was destined to fail" when he "only argued that he was treated differently" from another officer disciplined for similar conduct. *Id* at 4.

Subsequently, Tennessee courts have considered similar arguments from parties seeking to introduce evidence of disparate treatment not based on membership in a protected class. *See Holmes v. City of Memphis Civ. Serv. Comm'n*, No. W2016-00590-COA-R3-CV, 2017 WL 129113, at *8 (Tenn. Ct. App. Jan. 13, 2017) (finding a Civil Service Commission did not err by excluding evidence of disparate treatment when an employee did not allege the disparate treatment was based on membership in a suspect class and, "it makes sense to consider evidence intended to show disparate treatment violating equal protection only insofar as it is based on discrimination against a suspect class"); *see also Moss v. Shelby Cnty. Civ. Serv. Merit Bd.*, 665 S.W.3d 433, 446 (Tenn. 2023) (finding a merit board did not abuse its discretion when it determined evidence of disparate treatment was irrelevant where the plaintiff claimed he received harsher discipline than other, similarly situated individuals, but not that any disparate treatment was based on membership in a protected class).

Mr. White's assertion he received harsher treatment than another employee on its own was not enough to properly raise an equal protection claim. No proof was put on indicating gender or another suspect classification was the reason the parties were treated differently. Thus, because the amended petition does not allege any disparate treatment Mr. White suffered was based on membership in a suspect class, an equal protection argument was not properly presented. Because Mr. White failed to properly raise an equal protection argument at the chancery court, he is unable to have the cause remanded for consideration of the issue. We find Mr. White has waived any equal protection argument and hereby deny his request for remand.

**E. If the trial court erred when it reinstated Mr. White, then whether the matter**

**should be remanded to the chancery court to determine whether the appellee was bound by the findings of the Tennessee Secondary School Athletic Association's investigation.**

The Tennessee Secondary School Athletic Association ("TSSAA") is an athletic association which the Tennessee State Board of Education has recognized as the organization which is to supervise and regulate athletic competitions and activities of Tennessee public junior and senior high schools. *City Press Commc'ns, LLC v. Tenn. Secondary Sch. Athletic Ass'n*, 447 S.W.3d 230, 236 (Tenn. Ct. App. 2014). TSSAA "is also the only athletic association whose 'rules and regulations' have been expressly approved of by the State Board of Education." *Id.* When the grade issues became known at THS, TSSAA was contacted and conducted an investigation. No evidence is contained in the record which documents the investigation or its findings, only some brief testimony discusses the investigation. According to testimony, the investigation occurred in September 2016 and TSSAA determined that all THS student athletes were eligible to play football and that a championship won by THS was valid. Mr. White asserts that SCBE was bound by those findings and should not have disciplined him for any alleged grade changes. Mr. White seeks remand of the issue for consideration by the chancery court.

Mr. White argues SCBE's decision to terminate him was improper as SCBE "had no jurisdiction to contradict [TSSAA's] ruling." SCBE argues that TSSAA's findings pertained only to eligibility of THS players, and the validity of the championship won by Trezevant, not to any personal conduct of Mr. White. SCBE further argues that TSSAA decisions are not binding on its personnel decisions and there is no evidence indicating that TSSAA reviewed whether Coach White violated any district policies or ethics. SCBE further argues that Mr. White's contention that TSSAA determined there was no wrongdoing was not supported by evidence contained in the record.

There is no authority provided by Mr. White or discovered by this Court indicating that the decisions of TSSAA prevent a school from exercising discretion in matters of disciplining and/or terminating its personnel. Further, Mr. White's termination was partially based on a finding that he was dishonest with the Butler Snow investigators during the 2017 investigation and the TSSAA decision is irrelevant as to that matter. Thus, the matters are unrelated and SCBE would not be precluded from firing Mr. White for his dishonesty during the Butler Snow investigation.

Therefore, we decline to remand this case to the chancery court for consideration of whether the TSSAA decision regarding student eligibility required SCBE to retain Mr. White in his capacity as teacher and coach.

## IV. Conclusion

For these reasons, the judgment of the trial court is reversed. Costs of this appeal

are taxed to the appellant, Mr. Teli White, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE