IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2026 Session

## MATTHEW HAWN v. SULLIVAN COUNTY BOARD OF EDUCATION ET AL.

**Appeal from the Chancery Court for Sullivan County**
No. 22-CV-18963        Katherine Leigh Priester, Chancellor

———————————————————

**No. E2025-00027-COA-R3-CV**

———————————————————

This appeal concerns a local board of education's decision to dismiss a tenured teacher. The teacher sought judicial review of his dismissal in the trial court. The trial court found no grounds for dismissal and reversed the board's decision. The board appeals. We conclude that the teacher was insubordinate in showing his class a video containing profanity without parental consent. However, this lone act of insubordination did not warrant the drastic step of dismissal given the teacher's long record of good service. We affirm the trial court's judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J., E.S., joined. THOMAS R. FRIERSON, II, J., filed a separate opinion, concurring in part and dissenting in part.

Janet S. Hayes and Chris W. McCarty, Knoxville, Tennessee, for the appellants, Michael Hughes, Mark Ireson, Randall Jones, Evelyn Rafalowski, Paul Robinson, Mary Rouse, Matthew Spivey, and Sullivan County Board of Education.

Richard L. Colbert and Sarah M. Ingalls, Franklin, Tennessee, for the appellee, Matthew Hawn.

Alice O'Brien, Katherine E. Lamm, and Chad Nowlan, Washington, DC, for Amici Curiae National Education Association and The National Network of State Teachers of the Year.

# OPINION

## BACKGROUND

In 2005, Matthew Hawn ("Mr. Hawn") began teaching in Sullivan County schools. Mr. Hawn, a social studies teacher, later taught Contemporary Issues at Sullivan Central High School. Contemporary Issues involved the discussion and analysis of current events. The course had no prescribed curriculum, leaving the teacher discretion to choose material consistent with Tennessee's Social Studies Standards. Mr. Hawn taught Contemporary Issues for around eleven years. In 2021, after a series of controversies, the Sullivan County Board of Education ("the Board") fired Mr. Hawn for insubordination and unprofessional conduct. The events leading up to Mr. Hawn's dismissal began in the fall semester of 2020. At that time, the COVID-19 crisis was disrupting school, and the national political scene was volatile.

In August 2020, Mr. Hawn uploaded a video for his Contemporary Issues course on Google Classrooms for remote learning. The video was about the disparate treatment received by Jacob Blake, a black man shot by police during an arrest, and Kyle Rittenhouse, a white teenager able to peacefully surrender to police after shooting three people. In the uploaded video, Mr. Hawn stated: "White privilege is a fact. We're not going to discuss that, but what we are going to discuss is solutions to this problem of racism in the United States." While Mr. Hawn intended to post this video to the Contemporary Issues folder, he accidentally posted it to the folder for his Personal Finance class. This meant that the material was visible to people outside of Contemporary Issues. Parental complaints followed. In September 2020, Dr. Brent Palmer ("Dr. Palmer"), Supervisor of Instruction and Curriculum, emailed Mr. Hawn. Dr. Palmer drew Mr. Hawn's attention to the Tennessee Teacher Code of Ethics and its provision that teachers should not unreasonably deny students access to varying points of view. Dr. Palmer's exchange with Mr. Hawn was amicable. Dr. Palmer followed up with Mr. Hawn in an October 2020 email. This initial exchange did not constitute discipline.

In January 2021, Mr. Hawn assigned his students a portion of an essay by Ta-Nehisi Coates called "The First White President." The essay took a sharply critical look at President Donald J. Trump's 2016 election. In the wake of this assignment, a parent complained. The parent took issue with the essay's political bent and its quotations of others' profanity.[1] Principal Mark Foster ("Mr. Foster") told Mr. Hawn to stop the lesson. Asked later why he assigned a piece that contained profanity, Mr. Hawn explained that those were the words of the President and his Chief of Staff, they were used in the proper context, and he thought the students were mature enough to handle it. Mr. Hawn also made

---

[1] The essay included quotations of terms and phrases like "cuck," "piece of ass," and "Grab 'em by the pussy." It also included the N-word.

a statement to the effect that there were no liberal or conservative perspectives on an issue like racism.

On February 3, 2021, Ingrid Deloach ("Ms. Deloach"), Assistant Director of Schools and Human Resources Supervisor, issued Mr. Hawn a letter of reprimand. The letter of reprimand urged upon Mr. Hawn the importance of seeking parental consent when planning to use materials containing mature language. It also emphasized the significance of providing students with varying points of view. The letter of reprimand stated, in part:

> While Mr. Coates is unquestionably a gifted writer, I do question your judgement in assigning such an article with such terms to high school students. We often ask parents to sign permission slips when materials to be watched/covered in class could be questionable or too mature, yet you appear to have given that type of practice no consideration here. And I certainly expect more of our teachers, particularly ones assigned to teach a complex class like [Contemporary Issues].
>
> ***
>
> Your job is not to teach one perspective. Your job is also not to ensure students simply adopt your own personal perspective. Your job – in teaching [Contemporary Issues] – is to ensure students learn to seek out and consider varying and credible perspectives. Because you have not done that here in compliance with the Teacher Code of Ethics, and because your above responses show no acknowledgement of your own poor judgment, I am issuing this letter of reprimand based on your neglect of duty and insubordination.

Ms. Deloach mentioned the Wall Street Journal and National Review as examples of conservative sources that Mr. Hawn could share with students for balance. Mr. Hawn discussed his reprimand with Dr. Palmer, Ms. Deloach, and Director of Schools Dr. David Cox ("Dr. Cox"). Mr. Hawn expressed procedural concerns about his reprimand and appealed to the Board. The Board upheld the reprimand.

In April 2021, another incident occurred involving Mr. Hawn and Contemporary Issues. This time, the underlying subject matter was the case of Derek Chauvin, the police officer convicted for the murder of George Floyd. Amid class discussion, a student raised the concept of white privilege. In response, Mr. Hawn pursued the topic further. Mr. Hawn assigned an article by Peggy McIntosh called "White Privilege: Unpacking the Invisible Knapsack." Mr. Hawn also showed his class a YouTube video of the spoken word poem "White Privilege" by Kyla Jenée Lacey. In the video, the author spoke in raw terms of what she said were different realities for black and white Americans. The video contained

profanity.[2]  Nevertheless, Mr. Hawn did not provide the students' parents with notice or seek parental consent before playing the Lacey video.  Mr. Hawn attempted to mute the profanity, but he was not totally successful.  After playing the video, Mr. Hawn had the students break up into groups to research socioeconomic statistics to test the video's assertions.  Mr. Hawn also shared an article called "It's time to talk about 'black privilege'" and encouraged research into that concept.  As a result of the Lacey video incident, more complaints came in about Mr. Hawn.

Mr. Hawn subsequently told administrators that he muted the profanity in the Lacey video.  Dr. Cox instructed Mr. Foster to interview a sample of students to learn more about the incident.   Seven students were interviewed and confirmed that profanity slipped through despite Mr. Hawn's attempts to mute it.  One student had taken an in-class cell phone video.  It was revealed that the closed captioning was turned on at the start of the Lacey video.   Mr. Hawn later acknowledged that he failed to completely mute the profanity.

In the aftermath of the Lacey video, Mr. Hawn was suspended without pay and informed that charges for dismissal were being pursued against him.  On May 10, 2021, Dr. Cox formally submitted charges for dismissal against Mr. Hawn.  Dr. Cox sought Mr. Hawn's dismissal on grounds of insubordination and unprofessional conduct (also referred to as conduct unbecoming to a member of the teaching profession).  Dr. Cox cited the Lacey video and the Coates essay among other things.  Dr. Cox concluded as follows:

> As noted within the prior letter of reprimand, Hawn remained more than welcome to offer and discuss appropriate materials with Contemporary Issues students which provided a more liberal perspective, assuming he would know that would also require offering and discussing appropriate materials which provided a more conservative perspective on the same subject matter.  This crucial — and ethical — standard was lost on Hawn in early 2021, and it appears that it is still lost on him now.

Mr. Hawn responded to the charges against him in a letter.  In his response, Mr. Hawn acknowledged that some of the material he assigned might have been more suitable for a college setting.  Mr. Hawn also apologized for the profanity, as he recognized that it had the potential to make students feel uncomfortable.  Nonetheless, the Board voted 6-1 to proceed with dismissal.

Mr. Hawn, a tenured teacher, requested a hearing before an Impartial Hearing Officer to contest his dismissal in accordance with the Tennessee Teachers' Tenure Act (the "Tenure Act"), Tennessee Code Annotated section 49-5-501, *et seq.*  Mr. Hawn's

---

[2] The video included terms and phrases such as "shit," "fuck," "fucking," "asses," and "fuck my brains out."

- 4 -

request was granted, and an Impartial Hearing Officer conducted a three-day hearing. More than twenty witnesses testified, including administrators, students, and Mr. Hawn himself. The students who testified included both current students in Mr. Hawn's Contemporary Issues class as well as students who had Mr. Hawn as a teacher in earlier years. The great majority of the testimony was that Mr. Hawn provided a fair environment for discussion. In general, the students testified that Mr. Hawn permitted a range of views to be expressed, including conservative views. One student testified that she disagreed with Mr. Hawn's perceived political views, yet she never felt that she could not express her own opposing views in his classroom. Another student testified that Mr. Hawn was a good teacher who treated liberal and conservative students the same.

Two incidents particularly relevant to this appeal were addressed in the testimony before the Impartial Hearing Officer. One incident was Mr. Hawn's playing of the Lacey video. Mr. Hawn tried to mute the profanity but failed. Mr. Hawn acknowledged a remark he made before playing the video that "this might get me fired." He said that the remark was a joke.

In another incident, Mr. Hawn spoke with a female student who approached him, concerned that a group of male students did not believe white privilege was real. Mr. Hawn told the female student that "they don't know anything, oh it's fine." A male student testified that he felt he and his friends were the "target" of Mr. Hawn's remark and that Mr. Hawn dismissed those with more conservative views. Another male student testified that "I thought [Mr. Hawn] was saying that we're dumb."

Mr. Foster testified also. While Mr. Foster testified to his concern about mature language in instructional materials, he was very complimentary of Mr. Hawn overall. Mr. Foster stated: "I think Mr. Hawn is a great teacher. He's never had any issues with performance in terms of his evaluations. He's a very popular teacher. Kids really gravitate toward him and kids really gravitate toward his class and he's just -- he's a great teacher. There's no doubt about it."

Ms. Deloach testified regarding the Coates essay and her view that it was a liberal piece. Ms. Deloach said that it would have been good had Mr. Hawn offered a conservative perspective for balance. Regarding the circumstances of Mr. Hawn's reprimand, Ms. Deloach testified:

> Q. And were you -- did you ever discuss that with Dr. Cox, how he reacted to Mr. Hawn's answers?
> A. Yes, we agreed that they were very flippant answers and even had a tone of arrogance.
> Q. So what was decided in terms of what to do with Mr. Hawn after the article had been read, after the parent complaint had been considered, and after the answers came back from Dr. Palmer?

A. It was determined to issue a formal reprimand.

Q. Why -- why issue a reprimand there and not just give him a verbal warning?

A. Well, Dr. Palmer's original email was what we thought a verbal warning could have consisted of, but it seemed like after his responses to this, a verbal warning wouldn't have been effective.

Q. Are you referring to the fact that Dr. Palmer in September of 2020 issued an email to Mr. Hawn about the -- the Tennessee Code of Ethics?

A. Yes, sir.

Q. And that's been introduced so we won't go back into that but did the fact that Dr. Palmer had already issued that email to Mr. Hawn about the same class affect why you went straight to a verbal reprimand?

A. Yes, sir.

Q. Or I'm sorry, a written reprimand?

A. Yes, sir.

Q. Why not go farther than that at that point?  Why not go straight to a suspension?

A. Mr. Hawn's personnel file didn't indicate that there had been any problems in the past so we honestly thought that a formal reprimand may actually fix a mistake.

Q. At this point in early 2021, whether in your mind or in conversations with Dr. Cox, was there some big plan to get rid of Mr. Hawn?

A. No, sir.  We really thought that a reprimand could turn the behavior around and correct a good teacher back into the right path.

Mr. Hawn testified at the hearing as well.  Mr. Hawn acknowledged that he had seen the Lacey video before he showed it to his class and knew it contained profanity.  When questioned about his efforts to comply with the February 2021 letter of reprimand, Mr. Hawn stated:

Q. Do you feel that you made a sincere good faith effort to comply with the February reprimand?

A. Yes.

Q. In what way?

A. Well, whenever first noted about the -- the Tennessee Teacher Code of Ethics and varying viewpoints, I really took that to heart.  I did a really -- I did a lot of self-examination about my bias.  I talked with other colleagues, I talked with friends, I talked to family members, you know, I listened to a podcast about implicit bias.

And so whenever I was creating this lesson for the 2016 election, you know, that was the very first thing that -- that I went to and -- and I asked the kids that.  You know, I wanted to ensure that they understood that there are multiple ways to win -- that a person can win a political election and they --

and they know that. They showed that in our discussions. And I was never given the opportunity to finish that lesson. I'm sorry, I kind of went off -- what was your . . .

Q. That's okay.

***

A. Yes. And then after the reprimand, you know, like -- it's not like two weeks after the reprimand I was called back in. You know, I did more further examination. Okay. Well, you know, if we're going to talk about varying viewpoints, you know -- you know, what are they wanting, you know, how can I incorporate that into my lesson, am I still giving them my personal bias, you know.

And so whenever the topic of white privilege came up, I thought, 'Okay. Well, if I give the point of view from Peggy McIntosh, if I give the point of view from Kyla Lacey, if I give the point of view from Mr. Blake' -- you know, along with theses [sic] other units in -- or that these other lessons in this unit of anti-racism would look at it as a whole. There are varying viewpoints so all of that to the very complex issue of race in the United States. And I attempted to mute the cuss words.

Ultimately, the Impartial Hearing Officer upheld the Board's dismissal of Mr. Hawn on grounds of insubordination and unprofessional conduct. On December 14, 2021, the Board affirmed the Impartial Hearing Officer's decision. In a letter dated December 27, 2021, the Board provided Mr. Hawn with notice of his dismissal.

On January 25, 2022, Mr. Hawn filed a petition in the Chancery Court for Sullivan County ("the trial court") seeking judicial review of his dismissal under section 49-5-513 of the Tenure Act. Mr. Hawn sought to call expert witnesses in social studies education to testify before the trial court. In response, the Board filed a motion in limine to exclude the experts. The trial court permitted the experts to testify for the limited purpose of determining whether the Board's decision was arbitrary or capricious under section 49-5-513(g).

On August 26, 2024, the trial court heard Mr. Hawn's petition. Dr. Andrew Hostetler ("Dr. Hostetler") and Dr. Wayne Journell ("Dr. Journell"), specialists in social studies education, testified as experts. Dr. Palmer and Ms. Deloach testified as lay witnesses. Beyond this, the trial court's review was de novo on the administrative record. Dr. Palmer testified, in part:

Q. In your September email -- September 2020 email to Mr. Hawn, you quoted the teacher code of ethics -- a part of the teacher code of ethics,

the part that says, "A teacher should not unreasonably deny a student access to varying points of view," right?

A. Yes, that's in the standard.

Q. And -- but that's not the same thing as saying a teacher should affirmatively give students multiple points of view, is it?

A. There's a difference there, yes.

Q. Okay. And -- and whether we're talking about affirmatively giving a point of view or allowing discussion of a point of view, where an issue is settled, the teacher really doesn't necessarily need to do that, right?

A. Yes.

Q. Correct?

A. Correct.

Q. Okay. So -- so, for example, if -- if the class in contemporary issues is discussing the things going on in the Middle East right now, the war in Gaza, Israel's status in the Middle East, the tensions there, if -- if someone in the class were to bring up a suggestion that the Holocaust never happened, because the Holocaust deniers say that, would you think a teacher would be obligated to entertain that?

***

A. I think -- I think the teacher can -- can stamp that out and move on.

***

Q. Okay. And to your knowledge, after that, after the September 10, 2020 email, did Mr. Hawn at any point after that ever tell his students that white privilege is a fact?

A. I don't know the answer to that question. I don't know if he did or not.

Q. Did he -- to your knowledge, he didn't, right?

A. No.

Q. As far as you know?

A. Yes, as far as I know, that's correct.

Q. Okay. And as far as you know, did he ever not provide space in discussions -- classroom discussions after September 10th -- did he ever not provide space in discussions for students to objectively express their various opinions needed to fully exercise the critical-thinking experience?

A. I don't have any indication that he -- that he didn't provide that space.

Q. Okay. As far as you know, he did?

A. Yes. Correct.

- 8 -

Q. Okay. And to your knowledge, after September 10, did he ever deny students access to varying points of view?

A. Not that I know of.

On December 16, 2024, the trial court entered a 65-page order reversing the Board's decision to dismiss Mr. Hawn. After an exhaustive review of the facts, the trial court addressed grounds for Mr. Hawn's dismissal, beginning with insubordination:

> The Board argues that Hawn's attempted compliance and human failure are not appropriate bases for relief from the statute. The Board avers that Hawn had a duty to effectively redact the content since he selected material that contained profane language. However, the Board has not shown that Hawn's actions evidenced any willful intent. Hawn argues that his attempt to mute the profanity evidences a lack of intent and establishes Hawn's attempted compliance with the prior letter of reprimand.

> The Court finds that Hawn did attempt to mute the video but was not entirely successful in his endeavor. Much has been made about Hawn's statement made prior to playing the Lacey video. The Board argues that his statement that "this is going to get me fired" or words to that effect are sufficient to establish his refusal or continued failure to comply with the directives outlined in his letter of reprimand.

> The Court has watched the videos submitted as Exhibit 12 which evidence Hawn's unsuccessful attempt at muting. The Court has also considered the testimony of Hawn and the statements by the students. Some students that testified could not even recall the specific profane words that weren't redacted. However, most students also acknowledged Hawn's concerted efforts to mute and his apologies to the class when the muting was not successful.

> There is no dispute that Cox and Deloach both testified that had Hawn been successful in muting the video and redacting the profanity, the content of the Lacey video was otherwise acceptable. Therefore, the issue is not content but rather the slipping of three profane words. The Court finds that after considering the totality of the circumstances and the testimony of all parties that Hawn's unsuccessful attempt to mute the Lacey video does not rise to the level of insubordination as defined by Tenn. Code Ann. § 49-5-501(7).

The trial court also found that Mr. Hawn was not guilty of unprofessional conduct for failing to offer varying points of view. The trial court observed that Mr. Hawn offered

students multiple sources and encouraged them to conduct further research. The trial court stated that

> Hawn did offer other readings including the Peggy McIntosh article, Dr. Noland's statement and John Blake's article in addition to encouraging research and discussion about the topic. The Court finds that each reading provides a perspective from a different author who offered a different take on the issue of white privilege. There is no statutory requirement that Hawn offer an opposite view on any topic, the requirement is that the teacher not unreasonably deny the student access to varying points of view.

Regarding Mr. Hawn's overheard remark about some students 'not getting it' about white privilege, the trial court found that this was concerning but not the norm with Mr. Hawn. The trial court stated further:

> The Court finds that Hawn was a tenured teacher who was well liked by students, teachers and administrators. Hawn had an unblemished sixteen-year teaching record going into the 2020/2021 school year. Additionally, the instructional topic of white privilege was never prohibited by the administration during the 2020/2021 school year as confirmed by Cox, Deloach, Foster and Palmer. The evidence is uncontroverted that Hawn was an exceptional educator. There were a multitude of students that came forward and testified about what a wonderful teacher Hawn was and how much they took away from his class.
>
> Hawn provided students with a summary of the course and based upon the summary it was clear that the Contemporary Issues class would cover controversial topics. The Tennessee Social Studies Standards for Contemporary Issues contemplates inquiry-based learning where the teacher is more of a facilitator than a lecturer. There were many students that testified in this case and established that Hawn was a facilitator, that he approached sensitive and complex topic respectfully and that students were free to express their opinions. In essence, Hawn created an environment and safe space in his classroom where students were free to explore their own ideas and opinions along with the ideas and opinions of their classmates. Many students discussed how Hawn's Contemporary Issues class shaped them and prepared them for college and beyond. His students thought very highly of him, just as Hawn thought of his students. Hawn's attitude and feelings towards his students was evidenced by Hawn's fist-bumping [a student] after [the student] testified against him in the Board's case in chief.
>
> The proof also establishes that prior to his dismissal, Hawn attempted to gain both insight and guidance from Cox on how he should approach the

topic of white privilege with students moving forward and how to define varying. Hawn in his letter to Cox on May 7, 2021, was apologetic and it was clear that he was trying to find a workable path forward. In Hawn's letter he also expressed his apologies for his actions and reiterated his commitment to Sullivan County Schools and the students. Cox explained the reason for the escalation in the progressive discipline, from written reprimand straight to dismissal, was that it was clear that Hawn did not accept accountability, did not heed the prior reprimand, and provided no assurance that the issues would not continue to occur. The Court finds that this conclusion by Cox is not consistent with the testimony and exhibits in this case.

The trial court found that, even if grounds were established against Mr. Hawn, the escalation in discipline from a written reprimand to termination was excessive and arbitrary under the circumstances. The trial court ordered Mr. Hawn reinstated with back pay and pre- and post-judgment interest. The Board timely appealed to this Court.

## ISSUES

The Board identifies four issues on appeal, which we restate and reorder as follows:

1. Whether the trial court erroneously admitted testimony of experts proffered on Mr. Hawn's behalf.

2. Whether the trial court erroneously credited testimony regarding Mr. Hawn's likeability.

3. Whether the trial court erred in declining to find that Mr. Hawn engaged in unprofessional conduct under section 49-5-501(3).

4. Whether the trial court erred in declining to find that Mr. Hawn was insubordinate under section 49-5-501(7).

Mr. Hawn, for his part, raises the issue of whether the Board waived any challenge to the trial court's determination that dismissal was excessive.

## STANDARD OF REVIEW

Pursuant to section 49-5-513 of the Tenure Act, tenured teachers in Tennessee may seek judicial review of their dismissal by filing a petition for writ of certiorari in chancery court. *Ripley v. Anderson Cnty. Bd. of Educ.*, 293 S.W.3d 154, 156 (Tenn. Ct. App. 2008). The Tennessee Supreme Court has articulated the standard of review under the Tenure Act as follows:

- 11 -

Reading section 49-5-512(c)(4) and section 49-5-513(g) together, however, it is apparent that the standard of review under the Tenure Act is not the standard applicable to a common law writ of certiorari.  Instead, the standard of review specified in the statute is intended to permit the chancery court to address the intrinsic correctness of the school board's decision.  The appellate court in *Ripley* aptly described this standard of review: "The chancery court's review, as contemplated by [section 49-5-513], is a *de novo* review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination."  *Ripley*, 293 S.W.3d at 156 (citing *Lee*[ *v. Franklin Special Sch. Dist. Bd. of Educ.*], 237 S.W.3d [322,] 329 [(Tenn. Ct. App. 2007)]).  The teacher does not have the ability to present new evidence on the merits of the charges; the chancery court's *de novo* review is limited to the record of the school board proceedings. New evidence is only admissible "to establish arbitrary or capricious action or violation of statutory or constitutional rights by the board."  Tenn. Code Ann. § 49-5-513(g).

Appellate court review of the chancery court's decision is under the familiar Rule 13(d) of the Tennessee Rules of Appellate Procedure, applicable in non-jury cases, to determine whether the evidence preponderates in favor of the chancery court's findings of fact.  *Ripley*, 293 S.W.3d at 156.  Issues of law, of course, are reviewed *de novo*, with no presumption of correctness in the chancery court's conclusions.  *Id*.

*Emory v. Memphis City Schs. Bd. of Educ.*, 514 S.W.3d 129, 141–42 (Tenn. 2017). Regarding the admission of expert testimony, our Supreme Court has stated that

[g]enerally, questions pertaining to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion.  We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion.  A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party.

*Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (citations omitted).  With respect to witness credibility, the Tennessee Supreme Court has explained as follows:

Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility.  Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations.

Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.

In contrast, appellate review of documentary proof, such as depositions or other forms of testimony presented to the trial court in a "cold" record, differs considerably. When reviewing documentary proof, all impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial. As a result, appellate courts may make an independent assessment of the credibility of the documentary proof it reviews, without affording deference to the trial court's findings. This rule is premised on the fact that appellate courts are in just as good a position as the trial court to judge the credibility of witnesses who provided the proof.

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783–84 (Tenn. 1999) (citations omitted)).

## DISCUSSION

## I. Waiver

As it is potentially dispositive, we first address Mr. Hawn's separate issue of whether the Board waived any challenge to the trial court's determination that dismissal was excessive. Mr. Hawn notes that the Board did not specifically identify as an issue whether the trial court erred in its alternative holding that, even if statutory grounds for dismissal were established, dismissal would be an excessive punishment. Instead, the Board's stated issues focus on the underlying grounds for dismissal only. According to Mr. Hawn, the Board has waived appellate review of the trial court's ruling. *See Buckley v. Elephant Sanctuary in Tenn., Inc.*, 639 S.W.3d 38, 55 (Tenn. Ct. App. 2021) ("[W]here a trial court provides more than one separate and independent ground for its judgment and a party fails to appeal one or more of the independent grounds, we must affirm the judgment of the trial court on the ground that was not challenged on appeal.").

While the Board did not identify as a separate issue whether Mr. Hawn's dismissal was excessive, the Board spends much of its brief discussing the alleged wrongness of Mr. Hawn's actions and his defiance of authority. A fair reading of the Board's brief is that it is arguing that Mr. Hawn was guilty of insubordination and unprofessional conduct, that his dismissal was appropriate, and that the trial court erred in ruling otherwise. The conclusion of the Board's brief states that "this Board's decision to dismiss Mr. Hawn for insubordination and unprofessional conduct was appropriate" and that "[t]he Chancery Court's decision should be reversed." The Board's substantive arguments as to grounds for dismissal flesh out and explain the Board's reasoning for why it believes Mr. Hawn's actions warranted dismissal. These matters are all linked, and there is no mystery to the

- 13 -

Board's arguments.  We decline to find that the Board has waived appellate review of the trial court's ruling.

## II. The admission of additional evidence

Turning to the Board's issues, we first address whether the trial court erroneously admitted testimony of experts proffered on Mr. Hawn's behalf.  The Board argues that the trial court erred in admitting the expert testimony of Drs. Hostetler and Journell.  Under section 49-5-513(g) of the Tenure Act, "[a]dditional evidence or testimony shall not be admitted except as to establish arbitrary or capricious action or violation of statutory or constitutional rights by the board."  According to the Board, the trial court erred in admitting the experts' testimony because it was irrelevant to whether Mr. Hawn's dismissal was arbitrary or capricious; the experts did not meet the requirements of Tennessee Rule of Evidence 702 in that they did not offer any unique technical, scientific, or other information relevant to the issues; and the Board did not have enough time to evaluate the experts since Mr. Hawn disclosed them only two weeks before trial.

The trial court's decision to admit the expert testimony was discretionary in nature.  *See Brown*, 181 S.W.3d at 273.  As such, it is entitled to considerable deference on appeal.  In allowing the experts to testify, the trial court stated that it would assign their testimony whatever weight it saw fit or "disregard same if the Court finds that the testimony does not substantially assist the trier of fact."  While section 49-5-513(g) limits the scope of additional evidence in Tenure Act cases, it was not unreasonable for the trial court to deem the testimony of two social studies experts potentially probative in a case about a social studies teacher fired in part for the instructional materials he used in his class.  Notably, the Board did not challenge the qualifications of either expert.  The trial court neither applied an incorrect legal standard nor caused an injustice to the Board in allowing Drs. Hostetler and Journell to testify.  The trial court did not abuse its discretion.

Moreover, the testimony of Drs. Hostetler and Journell had no discernible impact on the trial court's decision.  Tennessee Rule of Appellate Procedure 36(b) provides in part that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."  Nothing in the trial court's order reversing the Board's decision shows any reliance on the testimony of either Dr. Hostetler or Dr. Journell.  Therefore, even if the trial court erred by admitting the testimony of these expert witnesses, such error was harmless.

## III. Testimony regarding Mr. Hawn's "likeability"

The Board argues that the trial court put undue credit in testimony concerning Mr. Hawn's "likeability," or popularity, with students.  According to the Board, Mr. Hawn's popularity with students has nothing to do with whether he was guilty of insubordination

or unprofessional conduct.  The Board observes further that many of the students who testified were students of Mr. Hawn from years before the 2020-2021 school year at issue. The Board notes that Mr. Hawn has previously acknowledged that his politics have become more polarized in the last three to five years.  Thus, the Board argues that former students of Mr. Hawn's from many years ago would not be aware of any recent changes in Mr. Hawn.  The Board also cites *Wilder v. Union Cnty. Bd. of Educ.*, No. E2013-02459-COA-R3-CV, 2014 WL 2733775, at *7 (Tenn. Ct. App. June 16, 2014), for the proposition that a tenured teacher may be fired for unprofessional conduct even if she has an exemplary record.  In *Wilder*, a tenured teacher was fired for hosting an underage drinking party.  *Id*. at *6–7.  She also pled guilty to a criminal charge of knowingly allowing underage persons to drink alcohol on her premises.  *Id*. at *6.

The Board is correct that Mr. Hawn's popularity with students ultimately has no bearing on whether he was insubordinate or engaged in unprofessional conduct.  However, the students' testimony before the Impartial Hearing Officer went beyond popularity. Students also testified to how Mr. Hawn conducted his classes and the sort of atmosphere he engendered in those classes.  This student testimony, which was overwhelmingly positive toward Mr. Hawn, went to the disputed issues of the case and was relevant for the trial court to consider.[3]  In determining whether the drastic step of dismissal is warranted when statutory grounds for dismissal have been proven against a tenured teacher, Tennessee courts consider the teacher's past conduct and any prior disciplinary actions. *See Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 690 (Tenn. Ct. App. 2018) ("In making that determination [of whether dismissal is warranted], the court examines prior conduct and prior disciplinary actions."); *Ripley*, 293 S.W.3d at 161–62 (considering a tenured middle school teacher's overall service record, as well as a statement by a student, in the analysis of whether her dismissal was warranted).  While Mr. Hawn's popularity is irrelevant on its own, the students' testimony was relevant insofar as it related to Mr. Hawn's overall service record and how he conducted his classes.

In addition, the Board's reliance on *Wilder* is misplaced.  The facts of *Wilder* are far removed from the facts of this case.  Mr. Hawn did not host an underage drinking party nor were his actions comparable to doing so.  Indeed, Mr. Hawn is not accused of any criminal conduct whatsoever.  The trial court committed no reversible error by considering and crediting the students' testimony as one factor in its analysis.

## IV. Unprofessional conduct

Under the Tenure Act, there are five statutory grounds for a tenured teacher's dismissal. Tenn. Code Ann. § 49-5-511(a)(2).  One of these grounds is "unprofessional

---

[3] Had students testified that Mr. Hawn squashed and repressed all opposing views, that too would have been relevant.  However, such was not the case here.

conduct." *Id.*[4]  As pertinent, "[c]onduct unbecoming to a member of the teaching profession" means "[d]isregard of the teacher code of ethics in part 10 of this chapter, in such manner as to make one obnoxious as a member of the profession[.]" Tenn. Code Ann. § 49-5-501(3)(D).  In essence, unprofessional conduct under the Tenure Act is "conduct indicating an unfitness to teach." *Morris v. Clarksville-Montgomery Cnty. Consol. Bd. of Educ.*, 867 S.W.2d 324, 330 (Tenn. Ct. App. 1993).  This has been described further as conduct that is "generally dishonorable, in violation of the ethical code, and has a negative effect on the school system, and indicates an unfitness to teach."  *Way v. Hall*, No. E2000-01458-COA-R3-CV, 2001 WL 293002, at *3 (Tenn. Ct. App. Mar. 27, 2001), *perm. app. denied* (Tenn. Sept. 17, 2001).

The Board argues that Mr. Hawn engaged in unprofessional conduct by his repeated selection of profane materials; by refusing to present varying points of view; and by belittling students who expressed opposing views.  Regarding its first argument, the Board cites *Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*, 819 F.2d 657 (6th Cir. 1987) in which a divided panel of the Sixth Circuit upheld a local school board's dismissal of a tenured high school teacher on grounds of unprofessional conduct under Kentucky law.  In *Fowler*, the teacher was fired for showing her class the R-rated movie *Pink Floyd—The Wall* during a non-instructional day at the end of the school year.  *Id*. at 658.  The *Fowler* court discussed the film's graphic and violent content.  *Id*. at 659.  The court concluded that the teacher had "introduced a controversial and sexually explicit movie into a classroom of adolescents without preview, preparation or discussion" and "abdicated her function as an educator." *Id*. at 666.  The court stated that the Kentucky statute on conduct unbecoming a teacher was sufficient notice to the teacher that her conduct would result in discipline.  *Id*.

While *Fowler* and the present case both involve a teacher playing a controversial video, the similarities essentially end there.  The Lacey video contained profanity, but it was not graphic in terms of nudity or violence like the film shown to the class in *Fowler*.  In addition, Mr. Hawn did not show the Lacey video to keep his students occupied on a non-instructional day; it was part of the class.  *Fowler* is simply not on point.

The Board argues further that Mr. Hawn's conduct was unprofessional in that his actions led to complaints that led in turn to investigations, all of which had the impact of disrupting learning.  However, that argument is circular.  Per this argument, the fact that complaints were made about Mr. Hawn could by itself serve as evidence that Mr. Hawn engaged in unprofessional conduct.  We do not believe that the General Assembly intended that outcome with the Tenure Act.  While the Board is correct that the negative effect of a teacher's conduct on his or her school is one relevant consideration in the analysis, the fact

---

[4] This Court noted in *Finney* that "section 49-5-501 uses the terms 'unprofessional conduct' and 'conduct unbecoming a member of the teaching profession' interchangeably." *Finney*, 576 S.W.3d at 685 n. 6.

that some people complained about Mr. Hawn does not prove by itself that his underlying conduct amounted to unprofessional conduct.

On the issue of denying varying points of view, the Board cites Mr. Hawn's assertion that white privilege exists and that there is no debate to be had on the subject. The Board also cites Mr. Hawn's pattern of working white privilege into lessons without offering opposing points of view. The Tennessee Teacher Code of Ethics provides that an educator shall "[n]ot unreasonably deny the student access to varying points of view." Tenn. Code Ann. § 49-5-1003(b)(5) (emphasis added). The provision thus refers to the unreasonable denial of varying points of view; it does not mandate the affirmative presentation of any specific point of view.

Mr. Hawn repeatedly returned to the concept of white privilege in his instruction. It is beyond the scope of this Opinion to investigate the merits of Mr. Hawn's views on the concept called white privilege. Our inquiry concerns whether Mr. Hawn unreasonably denied his students access to varying points of view. Based on our review of the record, he did not. The record contains no evidence that Mr. Hawn prevented students from learning about opposing points of view. While Mr. Hawn made a statement that there was no debate to be had about whether white privilege existed, he did not follow up on that statement by forbidding any disagreement from students. On the contrary, the evidence reflects that Mr. Hawn's classes were typified by discussion and the expression of multiple viewpoints. We find no evidence that Mr. Hawn unreasonably denied, or at all denied, students access to varying points of view.

Finally, the Board points to the incident in which Mr. Hawn told a student that a group of boys "don't know anything" and that their views would change. A female student had approached Mr. Hawn with dismay that a group of male students did not believe in white privilege. In an apparent attempt to console the student, Mr. Hawn made dismissive remarks about the male students. The remarks were overheard and caused at least one student to think that Mr. Hawn was saying he was dumb. Regardless of his intentions, Mr. Hawn's remarks were clumsy and insulting. Nevertheless, this unfortunate incident appears out of character for Mr. Hawn given his overall record. Mr. Hawn's remarks did not render him obnoxious to the teaching profession or unfit to teach. While regrettable, this incident did not rise to the level of unprofessional conduct under the Tenure Act. The evidence does not preponderate against the trial court's findings on this issue. We conclude that Mr. Hawn did not engage in unprofessional conduct.

## V. Insubordination

Insubordination is another statutory ground for a tenured teacher's dismissal under the Tenure Act. Tenn. Code Ann. § 49-5-511(a)(2). As relevant, insubordination means the "[r]efusal or continued failure to obey the school laws of this state, to comply with the rules and regulations of the board or to carry out specific assignments made by the board,

the director of schools or the principal, each acting within its own jurisdiction, when the rules, regulations and assignments are reasonable and not discriminatory[.]" Tenn. Code Ann. § 49-5-501(7)(A). This Court has stated that "a teacher is insubordinate when he or she *refuses* or *continually fails* to obey or to comply with the rules or to carry out specific assignments made by the principal, provided the rules and assignments are reasonable and not discriminatory." *Elmi v. Cheatham Cnty. Bd. of Educ.*, 546 S.W.3d 630, 637 (Tenn. Ct. App. 2017). In short, insubordination entails the willful disregard of authority. *See Morris*, 867 S.W.2d at 327.

The Board argues that, despite repeated warnings and a letter of reprimand, Mr. Hawn continued to promote one-sided views and show profane materials to his students. The Board contends that Mr. Hawn's insubordination was not a one-time occurrence but manifested in a pattern of disobeying authority.

With respect to the content of Mr. Hawn's course, we note that Contemporary Issues had no fixed curriculum. While administrators repeatedly told Mr. Hawn that he needed to offer varying points of view, they did not tell him exactly what he had to teach. For instance, the administration never told Mr. Hawn to stop teaching white privilege. It only told him to teach varying points of view. What those varying points of view were required to consist of is crucial to ascertain in determining whether Mr. Hawn disobeyed any instruction by the administration to teach a certain lesson such that his refusal to do so constituted an act of insubordination. Merely second-guessing Mr. Hawn's chosen course materials will not sustain insubordination.

Furthermore, it is unclear whether "varying points of views" in this context means opposite views or merely different views. If the latter, Mr. Hawn indisputably offered different views. If the former, it is still unclear what material Mr. Hawn was required to have assigned to avoid being insubordinate. Insubordination requires the defiance of a clear directive. *See Morris*, 867 S.W.2d at 328 (declining to find that a teacher had been insubordinate where the administrator had merely "discouraged" a practice). Barring any clear, unequivocal directives on what he was required to teach, we discern no insubordination on Mr. Hawn's part for the content of his lessons when the administration's substantive issues with his course were vague and the course itself lacked a definite curriculum.

While there was considerable ambiguity in the administration's directives to Mr. Hawn about its issues with the substantive content of his course, there was no ambiguity regarding the need for Mr. Hawn to seek parental consent before showing his students materials containing profanity. Despite this, in April 2021, Mr. Hawn played the Lacey video to his class without seeking parental consent beforehand. Mr. Hawn argues on appeal that he attempted to mute the profanity, and his failure to mute all of it was a good faith mistake. The trial court agreed with Mr. Hawn, finding that "the Board has not shown that

Hawn's actions evidenced any willful intent." The trial court also noted, but did not deem decisive, Mr. Hawn's remark before playing the Lacey video that he might get fired.

We disagree with Mr. Hawn concerning the Lacey video. Mr. Hawn said that his remark about possibly getting fired was a joke. Nevertheless, joke or not, the remark revealed Mr. Hawn's awareness that he was taking a risk by playing the Lacey video to his class without parental consent. Despite awareness of the risk as evidenced by his "joke," Mr. Hawn went ahead. The evidence preponderates against the trial court's finding that there was no showing of Mr. Hawn's willful intent. Mr. Hawn had been reprimanded only several weeks before, and he clearly understood that he was not allowed to show his students material containing profanity without parental consent. Even still, Mr. Hawn did just that. He was familiar with the Lacey video and knew it contained profanity. He was also just coming off a disciplinary episode in which part of the administration's case against him was his use of materials containing profanity without seeking parental consent. While Mr. Hawn tried to mute the profanity in the Lacey video, some of it slipped through anyway. Regardless of how sincere Mr. Hawn was in his attempt to mute the profanity, he failed. This was a risk Mr. Hawn chose to take. As a result, his students were exposed to profanity without their parents' consent in violation of the school administration's clear directives. We conclude that Mr. Hawn's playing of the Lacey video, including its profanity, to his class without parental consent was an act of insubordination.

## VI. Dismissal

Our conclusion that Mr. Hawn committed an act of insubordination does not end the inquiry. The trial court found that, even if statutory grounds for dismissal were established, dismissal would be arbitrary and excessive under the circumstances. "Whether dismissal is warranted . . . must be determined on a case by case basis after a careful review of attendant circumstances." *Ripley*, 293 S.W.3d at 157. Under the Tenure Act, a single act of insubordination does not necessarily justify the drastic step of termination. *See Elmi*, 546 S.W.3d at 639 ("Even if we were to consider [the tenured teacher's] tardiness on one day as an act of insubordination, one minor act of insubordination would not warrant her dismissal.").

In *Ripley*, a tenured middle school teacher, Ms. Ripley, was fired among other reasons for playing and discussing the Leonard Cohen song "The Future," which contains political and religious themes. 293 S.W.3d at 158, 161. The trial court ordered Ms. Ripley to be reinstated, and we affirmed. *Id*. at 154–55. As part of our analysis, we considered Ms. Ripley's fifteen-year record of service with only two relatively minor prior incidents, as well as her depressive state at the time of the underlying incident. *Id*. at 161–62. We also considered a student statement from a homeroom record stating that Ms. Ripley was a good teacher and that her behavior at issue "wasn't like her." *Id*. at 162.

Here, Mr. Hawn committed an act of insubordination by playing a video containing profanity to his class without parental consent despite knowing that he needed to seek and obtain parental consent first. We do not condone or minimize Mr. Hawn's act of insubordination. However, Tennessee jurisprudence on the Tenure Act is clear that it is not enough to find grounds for dismissal; the next step in the analysis is to consider whether dismissal is warranted under the circumstances.

Mr. Hawn taught in Sullivan County schools for sixteen years. Apart from the February 2021 letter of reprimand, he had never been disciplined. The student testimony about Mr. Hawn was overwhelmingly positive and emphasized that his classroom was a place for open discussion. Mr. Foster even said that Mr. Hawn was a "great teacher." Against this background, a conflict gradually developed between school administrators and Mr. Hawn during a period of national hardship. In the final analysis, it was incumbent upon Mr. Hawn to follow the clear directives of his administrators. In one instance—the playing of the Lacey video without parental consent—Mr. Hawn defied authority. This was insubordination, notwithstanding his failed effort to mute the profanity. However, Mr. Hawn has shown himself to be contrite on other occasions, such as by writing an apologetic letter in response to charges of dismissal.

We are unpersuaded by the Board's arguments that Mr. Hawn's conduct warranted dismissal. Mr. Hawn's prior conduct and overall service record weigh heavily against such a dramatic escalation in discipline. The trial court made detailed findings in its 65-page order reversing the Board's decision to dismiss Mr. Hawn. These findings reflect that Mr. Hawn had an exemplary teaching career. The evidence does not preponderate against the trial court's detailed findings as to Mr. Hawn's service record. Mr. Hawn was a well-liked and respected teacher for many years; his abrupt dismissal did not match his underlying offense or his record. Under all the circumstances of this case, and in view of Mr. Hawn's long record of good service for Sullivan County schools, we conclude that the Board's dismissal of Mr. Hawn over one isolated act of insubordination was excessive.

In summary, we conclude that Mr. Hawn committed an act of insubordination in playing the Lacey video containing profanity without parental consent. The trial court's judgment is modified to that extent. Otherwise, we affirm the judgment of the trial court, including its ruling that Mr. Hawn is to be re-instated with payment of his full salary plus pre- and post-judgment interest.

## CONCLUSION

The judgment of the Chancery Court for Sullivan County is hereby affirmed as modified. Costs on appeal are assessed to the appellant, the Sullivan County Board of Education, for which execution may issue if necessary.

_____

KRISTI M. DAVIS, JUDGE